THE STATE OF TEXAS, EX RELATOR JOHN B. MCNAMARA, COUNTY ATTORNEY, V. ERWIN J. CLARK, DISTRICT JUDGE, ET AL.

No. 3721.   Decided December 15, 1915.

Concurring opinion June 30, 1916.

**1.—Injunction—Writ of Prohibition—Jurisdiction—Pool Hall Law.**

Where the relator, as county attorney, filed his application for a writ of prohibition in this court against the district judge, who had ordered a temporary writ of injunction against the relator restraining him from instituting criminal proceedings to enforce the pool hall law and overruled an exception thereto, and it appeared from the record that said law had been legally adopted and that the petitioner for injunction owned pool and billiard tables before said law was adopted, and had rented a building in which to operate said tables and procured license after said law had been adopted and had been held valid by this court and invalid by the Supreme Court.   Held, that no vested property rights existed in said petitioner, and that said order for injunction was totally void, and that this court has the constitutional power to issue the writ of prohibition against said district judge as prayed for by the relator.   Davidson, Judge, dissenting.

**2.—Same—Supreme Court—Court of Criminal Appeals—Jurisdiction.**

The people of this State, in framing their Constitution, divided the jurisdiction of the civil and criminal courts of final resort, conferring upon the Supreme Court final jurisdiction in all civil matters, and upon the Court of Criminal Appeals final jurisdiction in all criminal matters.

**3.—Same—Constitutional Law—Jurisdiction—Criminal Offense—Pool Hall Law—Conflict of Decisions of Courts of Final Resort.**

The violation of the pool hall law, when finally adopted, is a criminal offense punishable by a fine or imprisonment, and no provision is made to collect any penalty for violating said law by any civil suit, and a decision of the Supreme Court of Texas, declaring said law invalid is not binding, but the Constitution of this State has made this court the court of final jurisdiction, and its decision holding the said law valid is final, and the civil courts have no jurisdiction to restrain by injunction an officer of the law from enforcing said law.·  Davidson, Judge, dissenting.

**4.—Same—Writ of Injunction—Equitable Remedy—Property and Civil Rights—Rule Stated.**

Since courts of equity deal only with civil and property rights, they will not interfere by injunction with criminal proceedings, having no jurisdiction or power to afford relief in such cases, unless the act concerning which an arrest or criminal prosecution is threatened affects civil or property rights and the enjoyment in protecting the same. In the pool hall law a penalty is denounced against no one except the person who shall run the pool hall in the prohibited territory, and no vested property right is involved therein, and, therefore, no injunction will lie to restrain an officer from the enforcement of said pool hall law. Following Ex parte Vaccarezza, 52 Texas Crim. Rep., 105, and other cases. Davidson, Judge, dissenting.

**5.—Same—License—Police Power—Vested Rights—Pool Hall Law.**

The pool hall law was passed under the police power of the State, and no one has a vested right in a license to run a pool hall. The permission granted by such license is a mere permit and is not a contract nor does it carry a vested right, and no property right being involved, an injunction will not lie against its enforcement.

**6.—Same—District Court—Jurisdiction—Injunction—Writ of Prohibition —Void Judgment.**

Where the District Court was without jurisdiction to issue a writ of injunction against a county attorney restraining him from enforcing a criminal statute, towit, the pool hall law, and such order was void and a nullity, and no adequate remedy existed to vacate said order, and the matter involved affects a public interest as distinguished from a private interest of the citizens, the writ of prohibition by this court, whose jurisdiction is thereby affected, may and is hereby issued, requiring the district judge to desist from further interference with or hindrance to said county attorney in bringing such criminal proceedings against the petitioner for injunction as said official may deem necessary. Following State ex rel. Looney v. Hamblen, 169 S. W. Rep., 678, and other cases. Davidson, Judge, dissenting.

**7.—Same—Jurisdiction—Constitutional Law—Supreme Court—Court of Criminal Appeals—Writ of Prohibition.**

The Court of Criminal Appeals has exclusive, supreme, and final jurisdiction in all criminal matters, and the Supreme Court has no jurisdiction whatever in criminal matters, but is prohibited from taking any such jurisdiction and is bound by the decision of the Court of Criminal Appeals when it declares a criminal law such as the pool hall law, valid, and a district judge has no jurisdiction or authority to restrain by the writ of injunction a county attorney or other proper officer from enforcing said pool hall law after this court has declared it valid and constitutional, and an original proceeding invoking the writ of prohibition annulling such order of injunction will lie to this court, and this court may constitutionally issue such writ to enforce its jurisdiction. Davidson, Judge, dissenting.

**8.—Same—Cases Discussed and Reviewed—Judicial Construction.**

See opinion for a discussion and review of the following cases: State v. Swisher, 17 Texas, 441; Brown Cracker, etc., Co., v. Dallas, 104 Texas, 290; Ex parte Mitchell, 177 S. W. Rep., 953; Grigsby v. Reid, 105 Texas, 697; Cohen v. Rice, 101 S. W. Rep., 1052; Winn et al. v. Dyas et al., 167 S. W. Rep., 294; Roper v. Lumpkins, 163 S. W. Rep., 110; Hooey v. Shekel, 105 Texas, 227; Conley v. Anderson, 164 S. W. Rep., 985; Milam County v. Bass, 106 Texas, 260; Ex parte Mode, 180 S. W. Rep., 708; Ex parte Francis, 72 Texas Crim. Rep., 304; Middleton v. Texas Power and Light Co., 185 S. W. Rep., 556; Garonzik v. State, 50 Texas Crim. Rep., 533; Ex parte Levine, 46 Texas Crim. Rep., 364; Ex parte King, 52 Texas Crim. Rep., 383; Ex parte Mussett, 72 Texas Crim. Rep., 487; Ex parte Zuccaro, 72 Texas Crim. Rep., 214, and other cases.

**9.—Same—Cases Distinguished—Jurisdiction—Vested Rights—Estoppel—Writ of Prohibition—Conflicting Decisions.**

Where the district judge had no jurisdiction over the subject matter alleged in the petition for injunction praying that the county attorney be restrained from criminally prosecuting the petitioner for violations of the pool hall law, inasmuch as this court had held that said law was valid and constitutional, the same being a criminal statute which could not be affected by a decision of the Supreme Court who held the same invalid, and it further appearing from the record that said petitioner had no vested property or civil rights in the premises and was estopped from ignoring the former judgment of this court, declaring said law constitutional, and that, therefore, the order of injunction by said district judge was a nullity and totally void, an original application for the writ of prohibition lies to this court to enforce its jurisdiction, and is hereby issued against said district judge to prevent him from enforcing said order of injunction. Distinguishing Ex parte Zuccarro, 72 Texas Crim. Rep., 214; Ex parte Mussett, 72 Texas Crim. Rep., 487, and other cases. Davidson, Judge, dissenting.

**10.—Same—Public Interest—Party to Suit—Estoppel—Citizen—Rule Stated.**

Where the matter adjudicated in an action in court affects the interests of the public as distinguished from the private interest of the citizen, all citizens are bound thereby, though not parties to that suit, and where this court, in the exercise of its exclusive and final jurisdiction, has decided that the pool hall law is valid, all citizens are bound thereby, although not parties to the proceeding in which it was so decided, and where the judgment of this court is interfered with in an original proceeding for injunction, this court in an original proceeding has the constitutional power, authority and jurisdiction to issue the writ of prohibition to enforce its jurisdiction and prevent a district judge from restraining by writ of injunction the officers of the law from enforcing said pool hall law. Following Hovey et al. v. Shepherd, 105 Texas, 237, and other cases. Davidson, Judge, dissenting.

**11.—Same—Habeas Corpus—Mandamus—Writ of Prohibition—Practice.**

Where this court, in the instant case, accomplishes the same result by the writ of prohibition, the question as to the writs of habeas corpus and mandamus, prayed for in relator's petition, need not be decided; however, see opinion for individual views expressed therein by Prendergast, Presiding Judge.

From McLennan County.

Original application praying for a writ of prohibition, etc., to prevent the district judge from enforcing an order for the writ of injunction against relator, restraining him as county attorney to institute criminal prosecutions, for violations of the pool hall law after the same had been adopted in McLennan County.

The opinion states the case.

*John B. McNamara* and *Damon C. Woods,* for relator.—Cited cases in opinion.

*Williams & Williams,* for respondents.—On question of void judgments: Tinsley v. State, 37 Texas Crim. Rep., 517; Japan v. State, 36 id., 482; Dickerson v. State, 30 Texas Crim. App., 448.

On question that Court of Criminal Appeals has no jurisdiction to issue the writ of prohibition in the instant case: Seele et al. v. State, 20 S. W. Rep., 946; Dunn et al. v. Railway Co., 88 S. W. Rep., 532;

Fannin County v. Hightower, 29 S. W. Rep., 187, and cases cited in the opinion.

C. C. *McDonald,* Assistant Attorney General, for the State.

HARPER, JUDGE.—The application of Hon. John B. McNamara, county attorney of McLennan County, filed in this court, would show that upon petition filed by Sam Reed in the District Court of the Seventy-fourth Judicial District, alleging "that he is the owner of eight pool and billiard tables, necessary balls, racks, etc., of the value of $1000; that he is renting a hall and paying therefor the sum of $35 per month; that he has procured State, county and city licenses at a cost of $40 to run a pool hall; that if allowed to run said hall he can earn the sum of $150 to $200 per month. He further alleges that at an election theretofore held in McLennan County, under a law adopted by the Legislature in 1913, known as the Pool Hall Law, the running of pool halls has been prohibited in McLennan County. He alleges that said Act of the Legislature is unconstitutional and void, but unless the said Hon. Jno. B. McNamara, county attorney, is enjoined, he will institute criminal proceedings against the said Sam Reed, wherefore he prays that a writ of injunction be granted restraining the said Jno. B. McNamara, and his assistants, from instituting any criminal proceedings under said law."

Upon the filing of said petition Hon. E. J. Clark, judge of the District Court of the Seventy-fourth Judicial District, endorsed thereon the following order: "The clerk is hereby directed to issue the writ of injunction as prayed for, this 7/26/1915." The clerk of the District Court, in obedience to said order, issued an injunction enjoining and restraining the county attorney from filing any complaint or information against the said Sam Reed for a violation of said law, which was duly served on the county attorney.

Upon application being first made to us by the county attorney seeking relief from such injunction, this court refused to issue any process until the county attorney had filed a motion or plea seeking the dissolution of said injunction. After the court had refused to dissolve the injunction, application was again made to us, when we issued temporary process, and set the cause down for hearing. Upon the hearing it was agreed that the evidence on the motion to dissolve showed:

1.   That if the pool hall law is valid, it had been legally adopted in McLennan County, and after said law had been adopted all pool halls were closed in McLennan County. That at the time of the adoption of said law Sam Reed owned the pool and billiard tables, but that he rented the building long after the adoption of the said law, and paid the city, county and State license long after the law had been adopted, and after the Court of Criminal Appeals in Ex parte Francis had held the law valid; and had not rented the building, nor obtained the State, county and city licenses until after the Supreme Court had rendered

the opinion in Ex parte Mitchell, in which that court held the law invalid.

The first inquiry to be made is, whether or not under the above state of facts it was within the jurisdiction and authority of the District Court of McLennan County to issue the writ of injunction under the Constitution and laws of this State. If so, then we would have no jurisdiction nor authority to interfere with the orders made by that court in granting the injunction, no matter how unwise we might deem its action. If it had jurisdiction and authority to issue the writ we can not pass on whether it acted properly or improperly in doing so. On the other hand, if the facts set out did not confer jurisdiction upon the District Court to issue the writ of injunction, then its action in doing so is wholly void, and if the order is void, and under it the enforcement of the criminal laws of this State is being restrained, we think, under the law, this court has not only the authority, but it is its duty to declare such order a nullity, in order that the county attorney may proceed with the proper performance of the duties enjoined on him by the other laws of this State the validity of which are not questioned.

Whether wisely or unwisely, the people of this State in framing their Constitution, divided the jurisdiction of the civil and criminal courts of final resort, conferring on the Supreme Court final jurisdiction in all civil matters, and upon this court final jurisdiction in all criminal matters. Section 3, article 5, defines the jurisdiction of the Supreme Court, and section 6 of said article defines the jurisdiction of the Courts of Civil Appeals, making it plain that the jurisdiction of those courts extends to civil cases only.

Section 5 of said article specifically provides that this court, the Court of Criminal Appeals, "shall have appellate jurisdiction co-extensive with the limits of the State in all criminal cases of whatever grade, and it is given the power to issue writs of habeas corpus, and issue all such other writs as may be necessary to enforce its jurisdiction."

Thus the people, in their Constitution, drew a definite line of division of jurisdiction and authority between the courts of this State, and if the pool hall law provided a penalty to be recovered by civil suit, this court would have no jurisdiction to inquire into the validity of the law, or to seek to enforce it or restrain its enforcement, and we would seek to exercise none. However, the Legislature, in its wisdom, saw proper to make a violation of that law a crime, and provide for the punishment for a violation of its provisions, enforceable only upon the filing of an indictment or information. Section 13 of the Act provides, when the law is put in operation in a given territory, "any person who shall thereafter operate or maintain a pool hall shall be subject to prosecution, and on conviction shall be punished by fine of not less than $25 and not to exceed $100, or by confinement in the county jail not less than thirty days nor more than one year, and each day such pool hall is run shall constitute a separate offense." No provision is made to collect any penalty for violating the law by any civil suit.

Unfortunately, the Supreme Court and this court arrived at different

conclusions as to the validity of this law. As said by us in Ex parte John Mode, recently decided but not yet officially reported, in upholding the validity of the law, had the Legislature provided for the recovery of a pecuniary penalty by a civil suit, we would concede that under the Constitution of this State, the opinion of the Supreme Court was binding, as it was given final jurisdiction in all civil suits. But the Legislature did not so provide, and made the enforcement of the law a criminal case, and of which cases the Constitution made this court the court of final jurisdiction, and this court has twice upheld the validity of the law, in suits brought to test its constitutionality. That question we do not care to again discuss, as we have so fully set forth our reasons in Ex parte John Mode, supra, and in Ex parte Francis, 72 Texas Crim. Rep., 304, 165 S. W. Rep., 147

The question next arises is, when have the civil courts the jurisdiction to restrain by injunction an officer from enforcing a criminal law which the civil courts deem unconstitutional, and especially in a State like this, where the civil and criminal jurisdiction of the courts have been separated, and two courts of final resort created.

A writ of injunction is an equitable remedy, and that well known author on Injunctions, Mr. High, says in section 68: "Since courts of equity deal only with civil and property rights, they will not interfere by injunction with criminal proceedings, *having no jurisdiction or power* to afford relief in such cases. Jurisdiction over such actions is conferred upon courts specially created to hear them, and with few exceptions, it is beyond the power of equity to control, or in any manner interfere with such proceedings by injunction. If, however, the act concerning which an arrest or criminal prosecution is threatened affects civil property and its enjoyment, in *protecting the property right,* equity may properly enjoin the criminal prosecution. But in such case its interference is founded solely upon the ground of injury to property and the necessity of preserving property rights. And where such rights are not clearly involved, the relief will be denied." And in section 1244 he says: "It necessarily follows from the doctrines above stated that when municipal ordinances have been enacted by proper authority, proceedings on the part of municipal officers for their enforcement will not be enjoined merely because of the alleged illegality of the ordinances. A court of equity will not, therefore, interfere by injunction to restrain municipal officers from prosecuting suits against complainants, or from interfering with their business because of their violation of municipal ordinances which are alleged to be illegal, since the question of the validity of such ordinances does not properly pertain to a court of equity when complainants have a perfect remedy at law, if the ordinances are invalid," citing many authorities and illustrations.

The American & English Ency. of Law, vol. 16, p. 370, lays down the rule: "It is a well settled rule, both in England and America, that a court of equity has no jurisdiction to interfere by injunction to restrain a criminal prosecution, whether the violations be for violations

of statutes or for an infraction of municipal ordinances. The rule applies whether the prosecution is by indictment or by summary process, and to prosecutions which are merely threatened or anticipated, as well as those which have already been commenced. If the prosecution is under an ordinance, no ground for enjoining it is constituted by the fact that the ordinance is void. There is a line of decisions which establishes an exception to the rule. In those cases where the enforcement of an ordinance or statute would work great injury to property rights, injunctions are allowed."

The Supreme Court of the United States is generally regarded as the highest authority on any question of law in this country. In the case of Ex parte Sawyer, 124 U. S., 200, that court says:

"Any jurisdiction over criminal matters that the English Court of Chancery ever had, became obsolete long ago, except as incidental to its peculiar jurisdiction for the protection of infants, or under its authority to issue writs of habeas corpus for the discharge of persons unlawfully imprisoned. 2 Hale, P. C., 147; Gee v. Pritchard, 2 Swanst., 402, 413; 1 Spence, Eq. Jur., 689; Attorney General v. Utica Ins. Co., 2 Johns. Ch., 371, 378.

"From long before the Declaration of Independence it has been settled in England that a bill to stay criminal proceedings is not within the jurisdiction of the court of chancery, whether those proceedings are by indictment or by summary process.

"Lord Chief Justice Holt, in declining, upon a motion in the Queen's Bench for an attachment against an attorney for professional misconduct, to make it part of the rule to show cause that he should not move for an injunction in chancery in the meantime said: 'Sure, chancery would not grant an injunction in a criminal matter under examination in this court; and if they did, this court would break it, and protect any that would proceed in contempt of it.' Holderstaffe v. Saunders, Cas. temp. Holt, 136; S. C., 6 Mod., 16.

"Lord Chancellor Hardwicke, while exercising the power of the court of chancery, incidental to the disposition of a case pending before it, of restraining a plaintiff, who had by his bill submitted his rights to its determination, from proceeding as to the same matter before another tribunal, either by indictment or by action, asserted in the strongest terms the want of any power or jurisdiction to entertain a bill for an injunction to stay criminal proceedings, saying: 'This court has not originally, and strictly, any restraining power over criminal prosecutions'; and again: 'This court has no jurisdiction to grant an injunction to stay proceedings on a mandamus; nor to an indictment; nor to an information; nor to a writ of prohibition, that I know of.' Mayor, etc., and Corporation of York v. Pilkington, 2 Atk., 302; S. C., 9 Mod., 273; Montague v. Dudman, 2 Ves. Sr., 396, 398. . . .

"Mr. Justice Story, in his Commentaries on Equity Jurisprudence, affirms the same doctrine. Story, Eq. Jur., 893. And in the American courts, so far as we are informed, it has been strictly and uniformly upheld, and has been applied alike whether the prosecutions or arrests

sought to be restrained arose under statutes of the State, or under municipal ordinances. West v. Mayor of N. Y., 10 Paige, 539; Davis v. Am. Society, etc., 75 N. Y., 362; Tyler v. Hammersley, 44 Conn., 419, 422; Stuart v. LaSalle Co., 83 Ill., 341; Devron v. First Municipality, 4 La. Ann., 11; Levy v. Shreveport, 27 La. Ann., 620; Moses v. Mobile, 52 Ala., 198; Gault v. Wallis, 53 Ga., 675; Phillips v. Stone Mountain, 61 Ga., 386; Cohen v. Goldsboro Comrs., 77 N. C., 2; Waters-Pierce Oil Co. v. Little Rock, 39 Ark., 412; Spink v. Francis, 19 Fed. Rep., 670, and 20 Fed. Rep., 567; Suess v. Noble, 31 Fed. Rep., 855."

And in Davis v. Los Angeles, 189 U. S., 207, the Supreme Court says: "That a court of equity has no general power to enjoin or stay criminal proceedings, unless to prohibit the invasion of rights of property, by the enforcement of an unconstitutional law, was so fully considered and settled in an elaborate opinion by Mr. Justice Gray in In Re Sawyer, 124 U. S., 200, that no further reference to authorities is deemed necessary."

Our own Supreme Court has followed this rule, and in Chisholm v. Adams, 71 Texas, 678, Chief Justice Stayton, speaking for the court, says: "It is too clear that a threatened prosecution for a violation of a law defining and prescribing punishment for crime, of whatever grade, furnishes no ground on which a court of equity can grant an injunction." And in the case of City of Austin v. Cemetery Assn., 87 Texas, 330, Chief Justice Gaines, speaking for the court, reiterates the rule, and holds "courts of criminal jurisdiction have power to enforce an observance of statutes against crime by visiting upon offenders the penalties affixed for their infraction, and ordinarily no one can call to his aid the powers of a court of equity in order to enforce their observance. Yet it has been held that the court will interfere to prevent acts amounting to crime if they *do not stop at crime, but also go to the destruction* or deterioration of the value of property." He illustrates the rule: "Suppose a city, not having the power under its charter to do so, should pass an ordinance prohibiting the sale of butchers' meat in a certain locality, and suppose it should also prohibit anyone from selling meat to be there sold or from buying in the prohibited place? The ordinance would be void, but could anyone say that the business of a market man in the locality might not be effectually destroyed by it? Under such circumstances we are of the opinion he should have the right to proceed against the corporation to enjoin its enforcement. *If a penalty was denounced against no one but the market man who should sell, it would seem his remedy would be to proceed with his business and defeat any prosecution that should be brought against him for the infraction of the void ordinance.*"

In the pool hall law a penalty is denounced against no one except the man who shall run a pool hall in the prohibited territory, and in such an instance, Chief Justice Gaines holds no injunction will lie, even though the ordinance be void. And this is the unbroken rule of decision in our Supreme Court—that no injunction will lie to restrain the enforcement of a criminal law, even though in their opinion void, unless

irreparable injury will be done to property rights. It is the property rights the court protects. In rendering this opinion Chief Justice Gaines recognized it was in conflict with a line of decisions holding that even in such instance an injunction will not lie, citing Wardens v. Washington, 109 N. C., 21, but he follows the rule that a court of equity may in such an instance protect property from irreparable injury, citing Atlanta v. Gas Light Co., 71 Ga., 106, as authority for so holding. When the Georgia court had rendered the opinion in the case of Atlanta v. Gas Light Co., supra, it appears that it was contended in that State (as some seem to contend in this State) that it was authority for holding that the civil courts would enjoin the enforcement of a law if they deemed it void, even though no vested property rights were involved, but the Supreme Court of Georgia, in the case of Paulk v. Mayor of Sycamore, 104 Ga., 24 (41 L. R. A., 772) made it plain that no such rule of law had been announced in the case of Atlanta v. Gas Light Co., supra, and adheres to the rule that "courts of equity will not by injunction prevent the institution of prosecutions for criminal offenses, whether the same be violations of State statutes or municipal ordinances; nor will they, upon a petition for an injunction of this nature inquire into the constitutionality of a legislative act making penal the act or acts for the doing of which prosecutions are threatened." They say: "It will be seen that the distinguishing feature of that case, and the one which was successfully employed in invoking the interposition of equity, was the patent fact that the threatened prosecutions under the municipal ordinance were being used for the purpose of destroying the *valuable, vested franchises* of the Gate City Gas Light Co., and equity would stretch forth its strong arm to prevent irreparable damages."

And this is the rule which Judge Gaines announces, that an injunction will issue only to prevent the destruction of vested property rights. Under the petition filed for injunction in the case we are considering, and under the facts agreed to, no vested civil property rights are or can be involved. But the case of Paulk v. Mayor of Sycamore, supra, is one in which the facts are almost identical with this one, and the Supreme Court of Georgia says:

"Here no question as to the destruction or invasion of civil rights which had become vested under a legislative charter is presented; and, so far as the record discloses the municipal authorities of Sycamore are simply endeavoring, in good faith, to enforce the penal provisions of the charter and ordinance of the city, the enactment of each of which appears to have been a bona fide effort to exercise the police power, for the protection and preservation of the peace and good order of the community. The plaintiff in error, with full knowledge that the charter of the city contained a provision prohibiting the sale of intoxicating liquors within its incorporated limits, and that one of its ordinances prohibited the keeping of such liquors for sale or barter therein, after seeking and taking legal advice, deliberately purchased a stock of whisky, beer, etc., procured State and Federal licenses, opened a 'store' in that

city, and commenced selling his stock, in defiance of the law and the ordinance. Having voluntarily gotten himself into this predicament, he now invokes the aid of equity to extricate him therefrom, upon the plea that his business will be ruined, without authority of law, unless he is accorded this relief. He deliberately undertook to test the validity of both the local law and ordinance of Sycamore, by voluntarily and knowingly engaging in the business which they prohibited. He has ample opportunity to make this test in the court having jurisdiction over criminal matters, and a court of equity will not invade their domain in his behalf.

"A case which is almost the exact counterpart of this one is that of Burnett v. Craig, 30 Ala., 135, 68 Am. Dec., 115, in which there was a bill for injunction, which alleged that the town council of Cahaba had passed an ordinance fixing a license for retailing within its incorporate limits; that the complainant had obtained a State license, and, acting upon legal advice that the ordinance was illegal, had opened a store in that town, and commenced retailing spirituous liquors; that he was thereupon arrested for violating the ordinance, and fined and imprisoned; that he had instituted a proceeding, which was still pending, to test the ordinance; and that the council still threatened to fine and imprison him as long as he persisted in carrying on his business. The prayer was that the municipal authorities be enjoined until the validity of the ordinance was determined by the legal proceedings. The bill was dismissed, in the court below, for want of equity; and the case was carried to the Supreme Court, where the judgment of the lower court was affirmed, the higher court holding that 'chancery . . . will not restrain quasi criminal proceedings on the part of the municipal authorities (of a municipal corporation) for repeated violations of an alleged invalid ordinance.' "

Our own civil courts also so hold. In the case of Lane v. Schultz & Buss, 146 S. W. Rep., 1012, the Court of Civil Appeals at San Antonio holds:

"Plaintiffs were doing business under a license granted them, and what they complain of is that the Comptroller and county judge were molesting them by threats of criminal prosecution for carrying on the business without a license. The foundation of their position is that they had a valid license, and that the acts of said officers, primarily the action of the Comptroller, were, under the circumstances, without warrant of law and void. We are satisfied that plaintiffs' right to do business under said new license can as readily, and more conclusively, be determined in the proposed criminal proceeding, if brought; and that if, as courts of equity, the District Courts of the State should assume jurisdiction to grant injunction in this class of cases, and forestall the criminal courts by trying the questions involved, it would be a precedent to practically transfer a large portion of the criminal jurisdiction to the civil docket, *where it does not belong.*

"Another very important consideration is that it would have to be held, in order to support the jurisdiction to grant injunction, that as

between the State and the liquor dealer the latter has a property right
in the license or privilege to carry on his business, and the authorities
are agreed that, as against the State, such right does not exist. It
would be useless to pursue the subject further in view of the reasoning
of the Supreme Court in Greiner-Kelly Drug Co. v. Truett, 97 Texas,
377, 79 S. W. Rep., 4."

The court then adds: "We express no opinion at this time on the
question whether or not the new license was rendered void by reason
of the forfeiture declared by the Comptroller of the 1910 license. What
we decide on this appeal is simply that the temporary injunctions were
improperly granted."

Our civil courts have also held that a license is but a permit, and
grants no vested rights that may not be revoked. In Hernandez v.
State, 135 S. W. Rep., 170, the Court of Civil Appeals at San Antonio
held:

"It can not be said that the license revoked by the order appealed
from was of such value as would form a basis for a civil case within the
jurisdiction of the County Court. A license to sell intoxicating liquors
is neither a contract nor a property right in the licensee, but a mere
permit to do what would otherwise be unlawful. It has none of the
elements of property, and confers none within the contemplation of the
constitutional provision that 'no person shall be deprived of life, liberty
or property without due process of law'; there being no vested right in
a license which a State may not take away when the interest of the
public may demand it. The rights and privileges of the licensee exist
solely by virtue of the law under which the license is granted and are
subject to the police power of the State under which the license was
granted, which power itself precludes the State from divesting itself
of it whenever the interest of the public may demand it. See Black,
Intoxicating Liquors, 127, 145, 150; Joyce, Intoxicating Liquors, 185,
186, 187, 190; Cooley's Constitutional Limitations (7th ed.), p. 887;
Crowley v. Christensen, 137 U. S., 86, 11 Sup. Ct., 13, 34 L. Ed., 620;
Youngblood v. Sexton, 32 Mich., 406, 20 Am. Rep., 654; Com. v.
Kinsley, 133 Mass., 578; Voight v. Excise Comrs., 59 N. J. Law, 358,
36 Atl., 686, 37 L. R. A., 292; Sprayberry v. Atlanta, 87 Ga., 120,
13 S. E., 197; Claussen v. Luverne, 103 Minn., 491, 115 N. W. Rep.,
643, 15 L. R. A. (N. S.), 698; Le Croiz v. County Commissioners, 50
Conn., 321, 47 Am. Rep., 648; Calder v. Kurby, 71 Mass., 597; Newson
v. City of Galveston, 76 Texas, 559, 13 S. W. Rep., 368, 7 L. R. A., 797."

In the case of Baldachi v. Goodlet, 145 S. W. Rep., 325, the Court
of Civil Appeals (Galveston district) held: "A license to sell intoxi-
cating liquor is a mere permit and not a vested property right or con-
tract right, and the State may, in the exercise of its police power, revoke
it." And the court held no injunction would issue. The rule an-
nounced in this case was affirmed by our Supreme Court, and a writ of
error refused.

Not only is this the holding of our civil courts, but this court has
held that a license is a bare permit. Ex parte Vaccarezza, 52 Texas

Crim. Rep., 105; Ex parte Lynn, 19 Texas Crim. App., 293. In those cases it was held that in revoking a license it was not a taking or destruction of property within the purview of the Constitution. Judge Willson says there is strong reasoning to support that position, "but opposed to these views there is a strong and almost uniform array of authorities which unequivocally declare that laws such as our local option law are within the scope of the police powers of a State, and do not take, damage or destroy private property for public use within the meaning of that provision of the organic law, and do not infringe upon any other provision of constitutional law." He was speaking of our local option liquor law, which revoked license, prevented the using of houses as a place of sale theretofore so used, the stock of liquors on hand, prospective profits, and the fixtures necessarily connected with said business. A man having a mere permit to pursue such business, the State had a right to revoke it,—one had no property right in such license. And the fact that the building would have to be used for some other purpose; that his stock of liquors could not be sold in that territory, and that his counters, shelving and glasses which were peculiarly applicable to that business could be no longer so used, was not taking away from him any vested right, nor destruction of property within the purview of the law. And as that law was passed under the police power, so was the pool hall law, and one has no more vested right in a license in one instance than in the other. Pool halls had become in some instances notoriously obnoxious and hurtful to the public welfare. In portions of the State, where there were no liquor saloons, and after 9:30 in other territory they had become in many instances the resort of thieves and criminals of every class. In them more than any other place is where the "bootlegging" in both dry and wet territory, was carried on. In this resort of the criminals, crimes were hatched, and the boys and young men who entered them were brought in contact with improper influences. They had become festering sores, and by this law an opportunity was given to those communities, where the pool hall had become the breeding place of vice, to close them under the police power of the State, and no man has a vested right to carry on any business that has become hurtful to the public welfare. It is a matter of common knowledge that they were so run in some instances as to be more obnoxious to the general welfare of the State than the open saloon. There were no restrictions around those who could obtain a license to run such a place as there were about the saloon; they were and are under no bond to obey the law, and we can not conceive how any court can hold that any person has a vested right to run that character of place, which a court of equity can or would protect by a writ of injunction. In the case of Littleton v. Burgess, 82 Pac. Rep., 864, the Supreme Court of Wyoming, in a case where the plaintiff had a license to run a gambling house, and sought to enjoin the county attorney from prosecuting him, claiming that it was an invasion of his rights, says:

"The principal question that confronts us, and one which we think

is decisive of this case, is whether a court of equity has jurisdiction to afford the relief sought by the plaintiff. The jurisdiction of a court of equity, unless expressly made so by statute, is limited to the protection of the rights of property. It has no jurisdiction over the prosecution of crimes. To assume such jurisdiction is to invade the domain of the courts of law, and both the executive and administrative departments of government. Let us investigate for a moment where the contention of plaintiff, if sustained, would lead. The defendant is the prosecuting attorney of Sheridan County, charged with the duty of prosecuting within his county all infractions of the criminal laws of the State. He was proceeding under the provisions of a general statute of the State making gambling a crime, and prohibiting the same. Criminal prosecutions are conducted in Wyoming in the name of the State. The prosecuting officer is a mere agent of the State, which is the real plaintiff in every criminal proceeding. We have, therefore, in this case the strange anomaly of a court of equity being asked to issue an order of injunction to restrain the State from exercising one of its highest prerogatives in the maintenance of government. Courts of equity possess no such power. To hold that they do, would be to invest them with power to restrain and paralyze the operation of the government itself in all its functions and departments. If a court of equity were to assume jurisdiction of the case at bar and try the issues involved, it would be equivalent to a trial of the criminal action here sought to be restrained. The guilt or innocence of the plaintiff would be the fundamental question for the court to determine, and, as bearing upon this feature of the case, the court would have to pass upon the constitutionality of the law under which the criminal proceedings were instituted, and the validity of the ordinance under which the licenses were granted to the plaintiff. These are proper matters of defense in the criminal proceedings. Under our system of jurisprudence, criminal actions can only be tried by a jury, while the trial of actions in equity have always been reposed in the court, and have never been the proper subject of reference to a jury. Neither the criminal actions against the plaintiff, nor the infirmities of the statute, if any there be, can be lawfully determined in this proceeding."

In Suess v. Noble, 31 Fed. Rep., 855, it is held: 'Public offenses are prosecuted in England in the name of the king, and in the United States in the name of the State. It is manifest that neither the king nor the State can be made a defendant in a bill in equity. The restraining power of a court of equity would be futile as against them, and it would avail nothing for the court to address its restraining process to public and private prosecutors, even if the power to do so existed, since the State could find other agents to represent it in criminal proceedings. Courts of equity deal only with civil and property rights. They have no jurisdiction to give relief in criminal cases, and they will not, therefore, interfere with the course of criminal justice."

A court of equity could not enjoin a grand jury from returning an indictment, if the grand jury saw proper to do so, and our Supreme

Court could not release on habeas corpus if they did do so, because their authority to issue such a writ is limited by the Constitution and laws of this State to restraint in a civil cause. (Art. 1529, Revised Statutes.) The jurisdiction of our Supreme Court is thus much more limited than in those States where the civil and criminal jurisdiction have not been divided and placed in two courts of final resort, and yet in those States where the court has final jurisdiction in both civil and criminal cases, the court of final resort held that there is no jurisdiction to restrain criminal actions by injunction, nor in such action to determine the validity of a statute. If the county attorney should be enjoined, the trial court under the law can appoint another officer to prosecute, and there is no power in our Supreme Court, nor in any court of equity, to enjoin a trial judge from trying such person, or appointing sufficient officers to see that the case is tried, if a county judge should deem it his duty to do so. Any court that has jurisdiction to issue an order or issue a writ should have authority to see that its orders are respected and obeyed, and so long as courts of equity deal with civil rights and the rights of property, they have that authority and power, but when they step beyond the jurisdiction conferred on them by law, then, and in that instance only, is the court without authority to enforce its decrees. As said by the New York court, in West v. Mayor, 10 Paige, 539: "The question as to the validity of the corporation ordinance (or statute) does not properly belong to this court for decision. And it would be an usurpation of jurisdiction by this court (a court of equity) if it should draw to itself the settlement of such questions in the discharge of the legitimate duties of the court."

In Phillips v. Mayor, 61 Ga., 386, it is held: "Injunctions or orders in the nature of injunctions are not granted by courts of equity to restrain proceedings in criminal matters. For this reason, whatever may have been the infirmities of the penal ordinances, an injunction was properly denied. Chancery takes no part in the administration of criminal law. It neither aids the criminal courts in the exercise of jurisdiction, nor restrains nor obstructs them."

The permission granted by these licenses is not a property right. A license is a mere permit. It is not a contract, nor does it carry a vested right. Littleton v. Burgess, supra. We could continue such quotations from the decisions of the various States, but we do not deem it necessary. Those who might desire to investigate the matter further will find that the following decisions, in addition to those already cited, hold in accordance with the above State's rules of law: Burnet v. Craid, 30 Ala., 135; Poyer v. Des Plaines, 123 Ill., 111; Ex parte Wimberly, 57 Miss., 437; Predigested Food Co. v. McNeal, 4 Ohio Dec., 356; McLaughlin v. Jones, 3 N. C. (Pa.), 203; Denver v. Beede, 25 Colo., 172; O'Brien v. Harris, 105 Ga., 732; New Home Sewing Machine Co. v. Fletcher, 44 Ark., 139; Seroab v. Madison, 49 Ind., 329; Ewing v. Webster City, 103 Iowa, 226; Hottinger v. New Orleans, 42 La Ann., 629; St. Peter's Episcopal Church v. Washington, 109 N. C., 21, and numerous cases cited in Cyc., vol. 22, pp. 903-904, under this statement

of the law. The general rule is that injunction will not be granted to stay criminal proceedings or quasi-criminal proceedings, whether the prosecution be for the violation of the common law or the infraction of statutes or municipal ordinances. But where the statute or ordinance is unconstitutional and void, and the prosecution may result in irreparable injury to property rights, an injunction will be granted. Nevertheless, where no property rights are involved, the injunction will not be granted. Among other cases cited by Cyc. is that of Yellowstone Kit v. Wood, 43 S. W. Rep., 1068, an opinion rendered by our Court of Civil Appeals at Dallas.

A license is in no sense property or contract. It is a mere temporary permit to do that which without would be illegal, issued in the exercise of the police power. Lantry v. Heightstown, 46 N. J. Law, 102; Vought v. Board of Excise Com., 46 Atl. Rep., 686; Metropolitan Board v. Barnie, 34 N. Y., 657; Powell v. State, 69 Ala., 10; LaCross v. Fairfield Co., 50 Conn., 321; State v. Gerhardt, 145 Ind., 439; State v. Mullenhuff, 74 Iowa, 271; Fell v. State, 42 Md., 71; Com. v. Brennan, 103 Mass., 70; Moore v. State, 48 Miss., 147; State v. Holmes, 38 N. H., 225; State v. Horton, 21 Ore., 83; Sights v. Yarnalls, 12 Gratt. (Va.), 292; Richland Co. v. Center, 59 Wis., 591; Sprayberry v. Atlanta, 87 Ga., 120.

The only question remaining to be discussed is the jurisdiction and authority of this court to grant the county attorney any relief from the injunction granted by the judge of the Seventy-fourth Judicial District. As before stated, if the District Court had jurisdiction and authority to grant the injunction, the writer is of the opinion this court would be powerless to grant any relief. But if under the allegation of the petition and the facts agreed to on file in this court, the District Court was without jurisdiction to grant the injunction, the injunction granted is null and void. Some authorities hold it would be the duty of the county attorney to ignore the injunction, and if the equity court sought to punish for such violation, to then apply to this court for relief under a writ of habeas corpus. But we think the action of the county attorney in obeying the injunction until its legality could be tested in the proper tribunal is the proper and better course to pursue, for if the various officers seek to sit in judgment on the decrees of courts, and ignore them when they deem them unauthorized, it would beget a disrespect for all law. Under the well established rules of law, as shown above, declared by our own civil courts and the courts of other States, there is no allegation in the petition that would authorize a writ of injunction under title 69 of the Revised Civil Statutes, and if no authority is there found, then the District Court was without jurisdiction to issue the writ. The Encyclopedia of Pleading & Practice, vol. 10, p. 804, lays down the rule: "A writ of prohibition will be issued by the Supreme Court to a judge or court which entertains a suit for injunction in a case in which there is no jurisdiction." It may be contended that as an appeal would lie from an order granting the injunction, that the county attorney would be re-

stricted to this remedy alone. If this remedy would be adequate, then such contention should be sustained. But by the issuance of the writ of injunction, the District Court has paralyzed the arm of the law, and all who might desire to do so, during the pendency of that appeal, could openly run pool halls in McLennan County, without restraint or restriction. Taking into consideration the law governing appeals in this State, the county attorney would be compelled to appeal to the Court of Civil Appeals, and if that court should decide that the writ was wrongfully issued, Mr. Reed could apply to the Supreme Court for a writ of error, and if granted, taking into consideration the well known condition of the docket of the Supreme Court, it would be two or three years before it could be finally determined whether or not the county attorney could institute criminal proceedings. In such a case, as said by the Supreme Court of West Virginia, in Swinbrin v. Smith, Judge, 15 W. Va., 483, "the remedy by appeal and writ of error is inadequate to meet the necessities of the case, and when this is the case, and the judge and court is proceeding without having any jurisdiction, or by the usurpation of power, a writ of prohibition ought to issue, although an appeal would lie." The court held: "The acts done by the judge of the circuit court were without authority and without any jurisdiction; they were null and void, and writs of prohibition should be awarded to prohibit said court from proceeding in said cases. A writ of prohibition may as well be granted to prohibit proceedings in a court of chancery as to a common law court," citing Firebrass case, 2 Salk., 550.

In the case of Thomas v. Mead et al., 36 Mo., 232, the Supreme Court of Missouri reviewed at great length the authorities, and held that "a 'prohibition' is an original remedial writ, and was provided by the common law as a remedy for encroachment of jurisdiction. It is directed to the judge and parties to a suit in an inferior jurisdiction, upon the ground that they have illegally assumed or transgressed the limits of their jurisdiction. If an inferior court misinterprets a statute, that is held to be a proceeding contrary to the statute, and when the courts of peculiar jurisdiction, as the Ecclesiastical or Admiralty court, which proceed in general according to the civil law, bring in question the statutes or common law of the realm, they are required to interpret, construe and expound them as they are expounded by the superior courts of common law, or as those courts shall say they ought to be expounded, when brought before them on prohibition. (Horne v. Carden, 2 H. Bl., 5337.) It was held in Gould v. Gapper (5 East, 345) in an elaborate decision by Lord Ellenborough, that the Court of Kings' Bench would prohibit the spiritual courts, or any inferior court, from proceeding upon the construction of an act of parliament, different from that which was put upon it by that court, notwithstanding there was a remedy by appeal or writ of error. Mr. Blackstone says of the writ of prohibition (3 Black. Com., 112): "It was the king's prerogative writ provided by common law as a remedy for 'encroachment upon jurisdiction.'" Again, "It will keep all inferior courts within

the bounds of their authority, and may either remove their proceedings to be determined here, or prohibit their progress below." (3 Black. Com., 41.) Says Justice Coke, from the King's Bench: "We, here in this court, may prohibit any court whatever, if they transgress and exceed their jurisdiction. And there is not any court in Westminster Hall but may be by us prohibited if they exceed their jurisdiction, and all this is clear and without any question." (Warner v. Sucterman, 3 Bulst., 119.) See also 2 Inst., 607; 2 Sel., 308; 6 Com. Dig., 105, 140; 6 Bac. Abr., 579, 600; Full v. Hutchins, Cowp., 424; Buggin v. Bennett, 4 Burr., 2035.

In Culpepper County v. Gorrell, 20 Gratt (Va.), 484, the Court of Appeals holds a prohibition is a proper remedy to restrain an inferior court from acting in a matter of which it has no jurisdiction, or from exceeding the bounds of its jurisdiction. See also Glide v. Yolo County, Super. Ct., 147 Cal., 21; State v. Lake Co. Dist. Ct., 26 Colo., 386; State v. Judge, 11 Jud. Dist., 48 La. Ann., 1501; State v. Aloe, 152 Mo., 466; State v. Fisk, 15 N. Dak., 219; State v. Moultineville, Race, S. C., 158; Ex parte Hill, 38 Ala., 429; Wood County v. Bowman, 34 W. Va., 87; Russell v. Jacoway, 33 Ark., 191; Fayeweather v. Morrison, 61 Conn., 431; State v. Superior Court, 13 Wash., 638; Ex parte Branch., 63 Ala., 383; Arnold v. Shields, 35 Ky., 18; Vermont Ry. Co. v. Franklin Co., 64 Mass., 12; Appo v. People, 20 N. Y., 531; State v. Hopkins, Dud (S. C.), 101; Jasper County v. Spiller, 13 Ind., 235; Thompson v. Tracy, 60 N. Y., 31; State v. Gary, 33 Wis., 93.

Our own courts have had this question before them, and followed the rule announced in the above opinions. In the case of Hooey v. Anderson, 105 Texas, 239, Chief Justice Brown, in speaking for the court, in construing the authority of the Supreme Court under article 3, section 5, of the Constitution, says: "The Supreme Court shall have authority to *issue such other writs as may be necessary to enforce its jurisdiction*," and holds it has power in an original proceeding for that purpose to issue the writ of prohibition to a district judge where necessary to prevent such officer from modifying by injunction the effect of a judgment of that court, and where the matter adjudicated in an action affected the *interest of the public*, as distinguished from private interest of the citizen, *all citizens are bound thereby*, though not parties to that suit, citing authorities which will be found collated in the report of that case. They reiterated that holding and issued a writ of prohibition in the case of Conley v. Anderson, 164 S. W. Rep., 985.

Shortly thereafter this court in the case of State ex rel. Looney v. Hamblen, District Judge, 74 Texas Crim. Rep., 526, 169 S. W. Rep., 678, issued a writ of prohibition to a district judge in a case wherein that court had no jurisdiction. And in the case of State v. Travis County Court, 76 Texas Crim. Rep., 147, 174 S. W. Rep., 365, held that in a case where the court had no jurisdiction, the writ of prohibition would issue. So it is no longer an open question in this State as to whether the Supreme Court or this court has authority to issue the writ of prohibition when necessary to enforce its jurisdiction. This

court, and it alone, is given appellate jurisdiction co-extensive with the limits of the State in all criminal cases of whatever grade, with such exceptions as may be prescribed by law. This is exclusive of all other courts, and in the same language as is the power given to the Supreme Court in civil cases "to issue such writs as may be necessary to enforce its own jurisdiction." If such language gives to the Supreme Court authority, as held by Chief Justice Brown in Hovey v. Anderson, supra, to issue an original writ of prohibition in civil cases, it certainly can not be contended that the language of the Constitution does not give to this court the same power and authority in criminal cases. And although Mr. Reed was not a party to the suit in the cases of Ex parte Francis or Ex parte Mode, supra, yet the State was a party, and the State is composed of all the people residing therein, and the question he presents, the validity of the law was there decided; he was a citizen of this State, and as said by Judge Brown in Hovey v. Anderson, supra, "the important question in the case is reached by the announcement of the well-settled proposition of law, that if the matter adjudicated affected the interest of the public as distinguished from private interest of the citizens of the State, although not parties to the suit, all citizens are concluded thereby," citing Cameron v. Nelson, 83 Iowa, 242; Wolfe v. Clark, 29 Iowa, 197; 2 Black on Judgments, sec. 584; McEntire v. Williams, 63 Kan., 275; Sampson v. Comrs., 115 Ill. App., 443.

The question adjudicated by this court in Ex parte Francis and Ex parte Mode, that the pool hall law is valid, certainly was one that affected the interest of the public, as contradistinguished from private interest, and, under the holding of our Supreme Court, it being a matter of which this court was given jurisdiction by the Constitution, all citizens are concluded thereby, and when District Courts seek to nullify that adjudication by issuing a writ of injunction, this court not only has authority, but it becomes its duty, to issue the writ of prohibition to be directed to Hon. E. J. Clark, judge of the District Court of the Seventy-fourth Judicial District, that he desist from further interference with or hindrance to Hon. Jno. B. McNamara, county attorney of McLennan County, in bringing such criminal proceedings as he deems it his duty an officer, under his official oath and the law, to bring. And issue to Sam Reed, and the attorneys in that case, that they desist from taking any steps to prevent the said John B. McNamara, county attorney, from instituting and prosecuting criminal proceedings if he deems it his duty to do so. And as the order made by Hon. E. J. Clark, judge of the Seventy-fourth Judicial District, in granting the injunction was void and a nullity, in that he exceeded the authority and jurisdiction granted him under the laws of this State, the said Jno. B. McNamara, county attorney, be and he is hereby released from all restraint sought to be placed upon him in the performance of his official duties by virtue of said void order and writ.

The writ of prohibition and all other necessary writs to secure the enforcement of this judgment will be issued by the clerk of this court.

*Writ of prohibition issued.*

DAVIDSON, JUDGE (dissenting).—I can not concur and will write.

DAVIDSON, JUDGE (dissenting).—The history of this case is briefly
this: Reed was the owner of one or more pool tables and was operating
them legally under the terms of the legislative Act requiring payment
of taxes for that purpose, but when Ex parte Francis, 72 Texas Crim.
Rep., 304, was decided by the majority of this court, upholding the
validity of the local option pool hall Act, Reed at once ceased to operate
his pool tables. Later the Supreme Court in Ex parte Mitchell, 177
S. W. Rep., 953, held the local option pool hall Act invalid and uncon-
stitutional. Thereupon Reed paid all taxes required by the State,
county, city and Federal authorities preparatory to opening his pool
hall and operating his pool tables. Looking to this, in addition to pay-
ing the taxes, he rented a house that cost $35 per month and spent
about a thousand dollars or such matter securing his tables, from which
he expected to realize something like $150 a month; such is substan-
tially the agreed statement of facts in regard to this phase of the case.
In this condition of things the county attorney, Mr. McNamara, threat-
ened Reed with criminal prosecutions for violating the local option pool
hall statute if he should operate his pool tables. The pool hall Act
had been favorably voted upon by the people of McLennan County, and
so far as that vote is concerned it was placed in operation in that county.
Reed's pool hall and tables were in the city of Waco, which, of course,
is in McLennan County. These threatened prosecutions were based
upon the proposition that the local option election had suspended the
tax law of the State and that, therefore, Reed could not operate his
pool tables under the tax law with which he had fully complied. Reed,
through his attorneys, Messrs. Williams & Williams, instituted injunc-
tion proceedings against the county attorney before Judge E. J. Clark,
district judge, who granted a temporary restraining order or injunction.
The county attorney then applied to the Court of Criminal Appeals for
a writ of habeas corpus, a writ of prohibition and writ of mandamus.
It seems from the opinion of Judge Harper that they did not then
grant any of these writs, but suggested to the county attorney that he
should move to dissolve the temporary injunction, and if this was re-
fused, then present his application to the Court of Criminal Appeals.
The motion was made to dissolve the injunction, which was refused by
Judge Clark, and an order entered to that effect, and further that all
the parties were to await the further order of his court. After the
entry of this order the county attorney again presented his application
for the three writs—habeas corpus, prohibition and mandamus. This
occurred in vacation, but was granted by Presiding Judge Prendergast
and Judge Harper. All three of the writs were included in the appli-
cation and granting order, and Judge Clark, Mr. Reed and his attor-
neys were prohibited from taking any steps or doing anything whatever
against the county attorney, McNamara, under and by virtue of the
injunction suit and orders. The case was set down by my brethren

for hearing on the 4th of October, upon the convening of this court. It was submitted on briefs and oral arguments at that time, and the court took it under advisement. Later Judge Harper wrote the opinion for the majority of the court overruling the district judge and sustaining the county attorney. In the opinion the writs of habeas corpus and mandamus seem not to have been discussed, but the opinion was based upon that part of the application which sought a writ of prohibition. So I take it for granted that the majority came to the conclusion that except as to the writ of prohibition their order was improvidently made. Be that as it may, they found that Judge Clark was in error in granting the temporary injunction and making his subsequent orders, and that he could not restrain the county attorney from prosecuting under the local option pool hall statute vitalized by reason of the favorable vote of the majority of the voters of McLennan County; that it was a binding and valid law by reason of that election, and that Reed was thereby interdicted from carrying on his pool hall or exhibiting his pool tables under the legislative tax Act. Under the tax Act he could run and operate his hall and tables; under the pool hall Act, if it is valid, he could not.

As I understand the record, Judge Clark has never finally disposed of the case before him. What his final order may have been in the premises would be to some extent speculative. He may or may not have perpetuated the injunction. The writer is of the opinion, however, that he should have perpetuated it. The authority of this court or its jurisdiction in the premises would depend, as a matter of course, and of law, upon the question of this court's jurisdiction to grant the writ of prohibition to restrain Judge Clark in the injunction case. That the order of the majority of this court is ultra vires and beyond their authority and jurisdiction is to the mind of the writer not even debatable, but the majority of the court having held the other way, I shall state some reasons why I am not concurring with them. In my conclusion, or from my viewpoint of the case and the law, and under the facts presented to this court, I am supported not only by the Constitution, but by the decisions of this court in Ex parte Mussett, 72 Texas Crim. Rep., 487, and Ex parte Zuccarro, 72 Texas Crim. Rep., 214. I also am of the opinion that I am further supported in this conclusion by the opinions of the majority in Ex parte Francis, 72 Texas Crim. Rep., 304, and Ex parte Mode, 73 Texas Crim. Rep., 432, 180 S. W. Rep., 708. These were all habeas corpus cases. In the Mussett and Zaccarro cases, supra, it was decided that contempt punishment for violation of injunction orders was a civil proceeding, of which the Court of Criminal Appeals could not entertain jurisdiction. That was the only assigned reason for dismissing the application for writs of habeas corpus in both of those cases. An inspection of those cases will show that injunction had been granted in each prohibiting and enjoining the owners of moving picture shows from operating their shows on Sunday, which in Ex parte Lingenfelter, 64 Texas Crim. Rep., 30, and Oliver v. State, 65 Texas Crim. Rep., 150, was declared

to be a violation of the Sunday law. I did not agree with my brethren in those matters, but their decision became law by the majority opinion applicable to "moving picture shows on Sunday." The parties, Mussett and Zaccarro, ignored and violated the injunction of the District Court of Tarrant County, and was by the district judge placed in contempt of his court, and punished as authorized by the statute, and to the limit. Each party applied to this court for a writ of habeas corpus, which was granted, set down for argument, heard on oral argument as well as on briefs. Subsequent to the submission of these cases Judge Harper wrote the opinion in Mussett's case, and Presiding Judge Prendergast wrote the opinion in the Zaccarro case, holding they were civil cases and this court had no jurisdiction, dismissing both cases from this court without prejudice should they make application to the Supreme Court. It seems Mussett and Zaccarro applied to the Supreme Court after the rendition of the opinions by the majority of this court, and were granted writs of habeas corpus, and discharged from custody, as they should have been. Speaking of the question as to whether the Zaccarro case was a civil or criminal case, Presiding Judge Prendergast uses this language: "We are met at the threshold of this inquiry by the question of whether or not this court has jurisdiction to grant the writ of habeas corpus in this case.

"*That the case in which this punishment in contempt was imposed is a civil case, we have no doubt. Any judgment which would have been rendered by the District Court of Tarrant County in said cause could only have been appealed, and by either party, to the civil courts of this State, and it could not have been appealed to this court.* (Italics mine.)

"By the Constitution of our State this court has jurisdiction in criminal cases only. It has no jurisdiction in civil cases of any character. It can not grant a writ of habeas corpus in any case except a criminal matter.

"Likewise, our Supreme Court, and the justices thereof, are given power and authority expressly by our Constitution to grant and hear writs of habeas corpus in all civil cases, and the Supreme Court, and neither of the justices thereof, have any jurisdiction, power or authority to grant such writs in criminal cases.

"*It is true that this court, in the case of Ex parte Allison, 48 Texas Crim. Rep., 634, in a matter practically exactly like this, granted and heard a writ of habeas corpus and decided it November 15, 1905. It may be that in other cases since then this court has first granted writs of habeas corpus in such matters. We can but believe that this court inadvertently did so without its attention being called to the amendment of our Constitution and especially to this statute.*"

The Allison case was subsequently brought before the Supreme Court and that court entertained jurisdiction. The Allison case was a violation of an injunction as was the case of Zaccarro, herein quoted.

Quoting from Ex parte Mussett, supra, which opinion was written by Judge Harper, I find this: "Without entering into a discussion of the merits of these two propositions, we are met at the threshold with

the grave proposition, even if relator is entitled to relief, to which court should the application for a writ of habeas corpus be presented—to this court or the Supreme Court? They are both courts of final jurisdiction, in matters in which they have any jurisdiction, and from the action of either no appeal will lie. If we assume jurisdiction, and order the writ to issue, it should be a finality whatever order we might make, and if the Supreme Court should entertain jurisdiction and order the writ to issue, likewise its orders should be a final disposition of the matter." The judge then enters into a discussion somewhat of the Allison case decided by the Court of Criminal Appeals, 48 Texas Crim. Rep., 634, and also the same case by the Supreme Court in 99 Texas, 455. Quoting further from the opinion in the Mussett case, this language is used:

"*That a suit brought to enjoin one from doing any act or thing, we think will be conceded by all to be a civil case. An appeal lies to the civil appellate branch and not to this court. That the suit instituted in the District Court of Tarrant County for a writ of injunction was a civil case will, we do not think, be questioned; that the order made by Judge Simmons was in this civil suit is certain, and it is equally certain that relator is restrained of his liberty by virtue of an alleged violation of this order, and an order made in that case. To our mind, taking into consideration our Constitution, and the amendment thereto, the acts of the Legislature, in pursuance of this amendment to the Constitution, quoted above, it was the clear intent and purpose, that in this character of case the application for a writ of habeas corpus should be addressed to the Supreme Court, and not to this court.* Its action will be final, and will finally determine the question of whether or not the civil courts have jurisdiction to entertain suits and enjoin in cases of this character where specific authority to do so has not been conferred on them by the Legislature. Any expression we might give upon that question would not bind the Supreme Court, while it would be the duty of all courts to abide the opinion of the Supreme Court in the premises, and it would be our pleasure to respect it as the opinion of the court having final jurisdiction in the matter.

"We have held that the *opening of shows of the character mentioned in plaintiff's petition was a violation of the Sunday law, and we adhere to that opinion,* and we are sure that the Supreme Court will and does appreciate the fact that our decision should be final in that matter. But *whether or not they can be enjoined from opening on the Sabbath involves a construction of the jurisdiction of District Courts in civil matters, and thus under the law, they are made the final arbiters, and we and all others should and will bow to their opinion.* (Italics mine.)

"Being of this opinion, the application to this court for a writ of habeas corpus is denied, but in so ordering it is done without prejudice to the right of relator to apply to the Supreme Court for a writ."

In the instant case the statement of facts shows that Judge Clark had granted an injunction restraining the county attorney from interfering with Mr. Reed in his pool hall exhibitions, or the running of

his pool tables.  The county attorney had not violated this injunction, and, therefore, the instant case is not burdened with contempt proceedings.  Here we have the simple question as to whether or not this court can issue a writ of habeas corpus or prohibition in a civil case without even a contempt punishment attached to it for any violation of the injunction.  In the Mussett and Zaccarro cases, supra, there had been an injunction.  This injunction had been violated and contempt proceedings instituted and the parties placed in contempt with a judgment awarded against them punishing by fine and imprisonment for disobedience of the injunction.  Here we have nothing of that sort.  *We have simply, only and purely an injunction.*  If the contempt proceeding in the Zaccarro and Mussett cases, supra, growing out of an injunction, was a civil matter, certainly this case can not be dignified as a criminal case, as none of the elements of criminality attach to it.  Mr. Reed had sued out his injunction upon the theory that he had prepared himself and paid out his money for a house, etc., and was deprived of pursuing his business.  He had a property right in the matter which he had a right to test.  He could not test this in a criminal action.  It could only be done in a civil case, and wherever his property rights are affected to a sufficient extent an injunction may be used to restrain the parties seeking to injure that business.  He is at least entitled to a hearing on the injunction, and if the court granting the injunction should agree with him he is entitled to its perpetuation.  He should be awarded the protection of the law against unlawful interference with his property rights.

Our Constitution provides that this court shall have authority to issue writs of habeas corpus.  This is general and will apply wherever a party is illegally restrained of his liberty.  McNamara, the county attorney, was not restrained of his liberty in this case, therefore the writ of habeas corpus could not apply.  Section 5 of article 5 of the Constitution reads as follows: "The Court of Criminal Appeals shall have appellate jurisdiction coextensive with the limits of the State in all criminal cases of whatever grade, with such exceptions and under such regulations as may be prescribed by law.  The Court of Criminal Appeals and the judges thereof shall have the power to issue the writ of habeas corpus, *and under such regulations as may be prescribed by law, issue such writs as may be necessary to enforce its own jurisdiction.*  The Court of Criminal Appeals shall have power upon affidavit or otherwise to ascertain such matters of fact as may be necessary to the exercise of its jurisdiction."  It will be seen from this language that not only the court but the judges of the Court of Criminal Appeals shall have power to issue writs of habeas corpus.  But it further provides that under such regulations as may be prescribed by law the court may issue such writs as are necessary to *"enforce its own jurisdiction."*  As was said by Presiding Judge Prendergast in the Zaccarro case, and Judge Harper in the Mussett case, supra, this court would have no authority to issue any writ in a civil case because of the fact this court has no jurisdiction in such cases, its jurisdiction being confined to crim-

inal cases. That an injunction suit is not a criminal case is fully adjudicated by those two decisions, and in fact it is not debatable. The fact that the injunction in this particular case is a civil matter is recognized in the opinion written in the instant case by Judge Harper. I quote, in this connection, from the opinion: "Taking into consideration the law governing appeals in this State, *the county attorney would be compelled to appeal to the Court of Civil Appeals, and if that court should decide that the writ was wrongfully issued, Mr. Reed could apply to the Supreme Court for a writ of error, and if granted, taking into consideration the well known condition of the docket of the Supreme Court, it would be two or three years before it could be finally determined whether or not the county attorney could institute criminal proceedings.*" This is an expressed recognition of the doctrine laid down by the majority opinion in Ex parte Mussett, supra, and Ex parte Zaccarro, supra. It is an emphatic statement that the county attorney *could not appeal to the Court of Criminal Appeals.* That he necessarily would have to go on his appeal to the Court of Civil Appeals, and thence, if the parties were not satisfied, by writ of error to the Supreme Court is expressly held. This ought to have settled this case with an opinion holding exactly the opposite of what the opinion does hold. *Delay in decision of a civil case does not confer jurisdiction of such case on this court.* The Constitution only authorizes this court to issue these extraordinary writs to *"enforce its own jurisdiction."* Const., art. 5, sec. 5; Hoony v. Shepperd, 105 Sup. Ct. Rep., 237. Especially see Milam Co. v. Bass, 106 Texas, 260. This last cited case so clearly, accurately and succinctly states the rule as to when writs of prohibition can issue to enforce the jurisdiction of the granting court I would quote freely from it but for the length of this dissent. That case shows the utter fallacy of the decision in this case. *This court can not issue extraordinary writs to acquire or assume jurisdiction of a matter that is a civil case and which under no circumstances this court could entertain jurisdiction or try.* If this court should not have jurisdiction and could not entertain jurisdiction in any given matter, it would be powerless to issue writs to enforce a jurisdiction in a matter over which it did not and could not have authority. *Nor can this court use the writ of prohibition as a regulatory process. It can only use it "to enforce its own jurisdiction."* It can not be used to prevent the District Court from exercising its jurisdiction. Milam Co. v. Bass, 106 Texas, 260.

There is some intimation in the opinion of the majority in this case that the pool hall law being a criminal law, that, therefore, this court could entertain jurisdiction of the injunction because it enjoined a threatened criminal prosecution. There was no criminal prosecution pending, if I understand the facts of the case as agreed to by the parties, but the county attorney was threatening to *prosecute for violations of the pool hall law.* But be that as it may, that identical question was decided by my brethren to the contrary in the Zaccarro and Mussett cases. There a *violation of the Sunday law was enjoined.* The majority

of this court held in Lingenfelder and Oliver cases that such was a criminal case, that is, a violation of the criminal statute which prohibited the exhibition of moving picture shows on Sunday. It was upon a disobedience of that injunction the parties were fined for contempt. They held the Mussett and Zaccarro cases were civil cases and that an appeal could not lie from an injunction to this court. They, therefore, dismissed the writs of habeas corpus in both cases, and the parties went to the Supreme Court for adjudication because *the cases were only civil proceedings.* That was the only question involved in those cases, and is the main question involved in this case. If this court had no jurisdiction of an appeal, and could have no jurisdiction of an appeal in an injunction case because it was a civil case, it would be a difficult proposition to assert, understand or to maintain that on account of the *"public interest"* or *delay* it might entail in the decision of the matters involved, therefore, this court could assume jurisdiction in a civil case, and this simply from the standpoint of public policy or "public interest," or the incidental delay of final decision on appeal by the civil courts. The Constitution placed those matters of "public interest," where they are civil cases, in the hands of those courts having jurisdiction of civil matters. It did not place them in the hands of those courts which alone have criminal jurisdiction. If the Constitution in dividing jurisdiction, awarding to the Supreme Court ultimate and final power in civil matters, and intermediately in the Courts of Civil Appeals, confining the jurisdiction of this court only to criminal cases and appeals in criminal cases, means anything, then this court can not have or entertain legally jurisdiction of civil matters, and especially in injunction cases that pertain to civil issues or property rights.

I do not purpose to review the question of injunction in criminal cases. My views are known, as shown in various dissents that I have taken occasion to write, commencing with Allison v. State, 48 Texas Crim. Rep., 634, down through the stages of the advancing injunction matters in criminal cases under what is, or seemed to be termed the "progressive and evolutionary authority of police power." I do not understand how it can be thought, under a constitutional form of government, that police power can reach beyond the plain provisions and inhibitions of the constitutional requirements or limitations. Nor can it be conceived how the police power can be used to overturn or override the plain exactions and provisions of the organic law. *Necessity* has been used to bolster and enlarge the police power, and the police power has been used to *aggravate and augment necessity,* but no power, police or otherwise, and no necessity, however urgent, should be entertained, and can not be legally entertained, that violates the provisions of our Constitution. It is the fundamental law, superior to all departments of the government. There is a limit to police power, which, under stress, is sometimes applied on assumption of power and relied upon to sustain such assumption in the face of the provisions of the Constitution, though in this connection it has been stated "that police power is inherent in government." That is a very latitudinous state-

ment, and one which as applied upon inspection and in final analysis is not correct. "Inherent power in Texas" is in the people, not in the government. Const., art. 1, sec. 2. The government can only exercise such authority as is conferred upon that government or its created departments through the "inherent power of the people." This is so by express provisions of the Constitution in the Bills of Rights. Section 2 of the Bill of Rights thus provides: "All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit. The faith of the people of Texas stands pledged to the preservation of a republican form of government, and subject to this limitation only, they have at all times the inalienable right to alter, reform or abolish their government in such manner as they may think expedient." The people have not conferred this power upon the government or the Legislature through empty sounding phrases of "police power." They have conferred upon the Legislature and other departments of government such authority as they saw proper to invest in them, to be exercised under the delegated authority, and to the end that there might not be any mistake about this and that the "inherent power of the people" might not pass from them to these agencies and departments of government, they saw proper to emphasize and re-emphasize "their inherent power" in the following language (sec. 29 of the Bill of Rights): "To guard against transgressions of the high powers herein delegated, we declare that everything in this 'Bill of Rights' is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void." If the "inherent power" is in the people, as is set forth in section 2 of the Bill of Rights, and not "in the government," it would be a difficult matter to understand how, in the face of the provisions of section 29 of the Bill of Rights, the Legislature may assume, without violating the Constitution, or this court uphold such assumption without direct infringement of the Constitution, any power by any department of government where the inhibition is set forth as it is in the Bill of Rights. This is a dangerous proposition to the liberty of Texas citizenship, and it is more than a dangerous proposition to the perpetuation of constitutional representative form of government. It means the overthrow, in the face of these provisions, of the plain inhibitions set forth in the Constitution and reserved by the people to themselves, and this by the agencies created by the people through their organic law. It is an assumption of original power. It ignores delegated authority.

I had not intended to write in any extended manner on this question, but regarding it as important I have written beyond what I originally purposed to write.

Another phase of this case I desire to mention. In Ex parte Francis, supra, as in Ex parte Mode, 77 Texas Crim. Rep., 432, 180 S. W. Rep., 708, the majority opinion concedes that if the Act in question delegates power or authority to enact, put into operation or suspend a law of the

State, it would be unconstitutional. In both cases the opinion concedes that if there was a delegation of authority by the Legislature to the people in regard to the local option election under the pool hall law, or if having exercised such authority, and by reason of the vote under the provisions of that act the pool hall law went into effect, and operated to suspend any law of Texas, the pool hall law would be invalid. However, those opinions both hold that it was neither a delegation of authority nor could it operate to suspend any State law. The Supreme Court took the opposite view and held it unconstitutional. Ex parte Mitchell, 177 S. W. Rep., 953. The majority of that court held that local option law invalid. Judge Hawkins dissented. The majority of this court held it valid, the writer dissenting. Now, this case brings the matter to a crisis. The issue is as sharply made by the facts as is possible for facts to make an issue, and clearly demonstrates the correctness of the view of the Supreme Court, and the views expressed by the writer's dissenting opinions. The opinion in this case by the majority is in direct conflict with what they wrote in the Zaccaro and Mussett cases, supra. In the instant case the agreed facts show that Reed was operating a pool hall, exhibiting his tables, etc., when the Francis case was written. The people of McLennan County voted the pool hall law into operation under the provisions of the Act authorizing such election. When the Francis case was written Reed ceased operating his pool tables. However, when the Supreme Court wrote the opinion in the Mitchell case he prepared himself to exhibit and operate his tables. He complied with the tax law fully, so far as its provisions were concerned, taking all necessary steps. The injunction proceedings followed, and the county attorney was enjoined from prosecuting Reed. Now we have two laws: one directly by the Legislature under which Reed was authorized to operate his pool tables by paying the specified tax, and under the other law he was interdicted under heavy penalties from exhibiting his pool tables. He was met under this condition of things with threatened prosecution because the pool hall law had been voted into operation by the people of McLennan County. Now if the tax law was not suspended by the local option law vitalizing the pool hall Act, he certainly could operate his tables, had a legal right to do so, because he had fully complied with the tax law. If the pool hall law was operative in that county, it necessarily suspended the operation of the tax law, else Mr. Reed could exhibit his tables. My brethren deciding this case and restraining Judge Clark by virtue of their writ of prohibition, had necessarily to decide that the pool hall law superseded the tax law. If the tax law was not suspended, Reed had the legal right to operate his tables after paying the required taxes. If it was suspended by the pool hall vote, then the pool hall law was unconstitutional, admittedly so by the majority opinions in the Francis and Mode cases, supra, and if the law was unconstitutional by reason of the suspension, then Reed could operate his tables, because the tax law still remained in full force. Therefore the issue of suspension of the tax law vel non is the critical

issue in this case, and it is the only real issue decided.   Both laws could not legally operate in the same territory at the same time, and it is held in the prevailing opinion in this case that Reed could not operate his tables, and Judge Clark was ordered not to interfere with the county attorney in prosecuting him for violations of the local option pool hall Act.   Under one of these laws he could operate; under the other he could not.   One is a general Act of the Legislature, operative throughout the State, and was a revenue measure.   The other was necessarily inoperative; at least until a vote of the people of a given community had vitalized it.   The pool hall law would remain dormant until the end of time if the local option vote did not put it into operation.   It could never interfere with the tax law until the local option election was held resulting favorably to the pool hall law.   After that favorable action my brethren sustain the pool hall law and hold that the party can not operate his tables under the tax law.   They hold the Legislature could authorize such elections.   If they are correct, it is evident that such elections can only be held by virtue of the pool hall law.   There is no other authority relied upon or shown which justifies such election.   This is necessarily the reason, and the only reason, why Reed could not operate his tables, and it is the only reason assigned by the opinion of the majority upholding the local option pool hall law and restraining Judge Clark from interfering with the county attorney in his prosecution of violations of the pool hall Act.   So if Reed operated his tables under the tax law he would be punished under the pool hall law, and if the tax law was inoperative it was so because the pool hall law had suspended it.   The two Acts can not coexist and both be enforced, and this decision by the majority necessarily adjudicates the fact that the pool hall law did supersede the tax law and put it out of operation, else there is no basis for their opinion.   Their opinion finds no other basis for support and assigns no other reason.   Judge Clark may have granted the injunction upon the theory that the pool hall law operated a suspension of the tax law, and was, therefore, void.   This was in accord with the opinion of the Supreme Court.   It was also in accord with the majority opinion of this court in the Francis and Mode cases as well as the writer's dissenting opinion.   The Francis and Mode cases both concede and hold that if the local option election operated a suspension of the tax law, it would be invalid and unconstitutional.   Here we have the majority opinion expressly holding that it did suspend the tax law.   It is the basis of their opinion, and if that proposition is taken out of their opinion, there is no reason for the conclusion they have reached.   If this was not a delegation of authority by the Legislature to the people to hold a local option election, it may be pertinently asked from what source did these voters obtain the authority to hold that local option election?   It is only found in the body of the Act, and it is found nowhere else.   The Legislature placed it there.   The people exercised it, voted favorably upon the pool hall law, and this necessarily, under the prevailing opinion, in this case, voted out and suspended the tax law.   If this is not a delegation of authority to those

people to vitalize the local option pool hall law, it would be difficult to understand what it is, or what is its operation. The exercise of that authority by the people vitalized the pool hall law in McLennan County, and the pool hall law was not vitalized otherwise, and if it was not thus vitalized and put into operation, it necessarily is not in existence, and if it becomes operative, as my brethren hold in restraining Judge Clark, it necessarily suspends and puts out of operation the tax law. Of course, this is upon the theory that the local option election was a legal one, and my brethren 'hold that it is. It can not be legal as I understand the law. So from any viewpoint, whether from the decision of the Supreme Court in the Mitchell case, or the opinion of the majority and dissenting opinion in this court in Francis and Mode cases, it is not only a delegation of authority to vote out the tax law by local option election, but it was actually consummated by voting the pool hall law into existence, which necessarily, if the election be valid, brought a suspension of the tax law. I cite the Mode and Francis cases, and the Mitchell case, and the majority opinion in the instant case in support of that proposition. If the local option election had failed to carry, the tax law would have remained in full force and effect. As the local option election did carry, the tax law ceased, at least the majority so hold in this case. The pool hall election won. This put out of operation the tax law; at least this is the decision of the majority in this case. I can not see how my brethren reached their conclusion, viewed from any legal standpoint.

I might follow this with other reasoning, but it seems to me this is sufficient. I desired to express some views about the matter, which I have done. I, therefore, enter respectfully my dissent from the conclusion reached by the majority in this case. Judge Clark should not have been restrained, and the only authority for restraining him is that the pool hall local option election suspended the tax law.

June 30, 1916.

PRENDERGAST, PRESIDING JUDGE (concurring).—When our State was first organized as a State government one appellate court only was created named "The Supreme Court." The people by our then Constitution (1845) expressly gave it appellate jurisdiction of both criminal and civil causes, direct from the trial courts. Like jurisdiction—of both criminal and civil—was then also given to such courts of final appellate jurisdiction of every other State of the United States, and in England and Canada, whatever named—in fact, of every English speaking people on the globe. And with some minor exceptions, our Constitutions of 1861, 1866 and 1869, were to the same effect.

The rapid increase in population, and consequent increase in legal business, in our State, soon after the war (by 1876), showed that it was impossible for one appellate court to dispose of all business, criminal and civil. This was demonstrated by the fact that our Supreme Court by that time was some three or four years behind in its de-

cisions,—like it is now,—and every day getting still further behind. It was then not infrequent for persons convicted of crime, who appealed, to have to lie in jail for a year or longer, awaiting a decision of their cases,—an outrage on justice and humanity, and a very great, and unnecessary, expense to our counties and State. The Supreme Court itself, in endeavoring to avoid this, began to devote more of its time to deciding criminal, to the necessary neglect of civil, causes, thereby, in effect, denying justice in all civil causes.

With this state of fact staring them in the face, and getting worse, day by day, our people wisely and humanely determined to remedy these crying evils. It was then (1876) thought by our people and wisest and best statesmen that a solution would be had by taking all jurisdiction of *criminal* business away from the Supreme Court, confining it exclusively to civil business, and creating a new appellate court of *supreme and final jurisdiction in all criminal matters.* So this was done by the people in their Constitution of 1876. That is, they changed the jurisdiction of our Supreme Court so as to deprive it absolutely of any and all jurisdiction in criminal matters, and created a new court called "Court of Appeals," and gave it *supreme and exclusive jurisdiction in all criminal matters.* At that time it was believed that this new appellate court could not only keep up with all criminal business, but could also decide and keep up with appeals in civil causes from our County Courts as well; hence, appeals from our County Courts in civil matters were denied the Supreme Court, and jurisdiction thereof given exclusively to said new appellate court.

By actual experience, as early as 1891, it was demonstrated that the Supreme Court could not even keep up with its civil appellate jurisdiction as restricted by our Constitution of 1876, and that said new appellate court could not keep up with its exclusive jurisdiction in criminal matters, and appeals too from our County Courts in civil matters, and also that it was very bad policy to have two tribunals of final appellate jurisdiction in civil matters, so that in 1891 the people determined to again give relief, and amended our 1876 Constitution, and then created *Courts of Civil Appeals,* and gave them exclusive appellate jurisdiction in all civil matters direct from the trial courts, and further restricted the jurisdiction of the Supreme Court, not only exclusively to civil matters, but even as to certain character of civil matters, made the decision of said civil appellate courts final, and prohibited the Supreme Court from having any jurisdiction thereof; and also prohibited jurisdiction to the Supreme Court from any trial court, and restricted its jurisdiction to certain character of civil business from the new Courts of Civil Appeals alone. And at the same time, the people by these amendments of 1891, absolutely took *all civil jurisdiction* away from said "Court of Appeals," changed its name to "The Court of *Criminal* Appeals," and restricted its jurisdiction exclusively to *criminal* matters.

It is needless to call attention to the recent legislation, authorized

by said 1891 amendments, still further restricting the jurisdiction of the Supreme Court in even civil matters.

The fact that the people by their Constitution and amendments thereto, as stated, have taken absolutely all jurisdiction in *criminal* matters, and a great deal of its original civil jurisdiction, away from the Supreme Court, has not been from any lack of confidence therein, or the great judges who have constituted that court, but has been from actual necessity. Since our people have thus provided a court of supreme, final and exclusive jurisdiction in criminal matters, and first set the example, several other States of the United States, and England and Canada, have adopted our plan, and likewise have established courts of exclusive jurisdiction in criminal matters.

I have given briefly the constitutional history of our appellate courts, so as to show the reason, and to emphasize the facts, that:

1.   The Court of Criminal Appeals has *exclusive, supreme and final* jurisdiction in all *criminal* matters, and

2.   The Supreme Court has *no* jurisdiction whatever in *criminal* matters, but it is *prohibited* from taking any such jurisdiction, and that it has only very limited appellate jurisdiction in even civil matters. (The sole exception to what might be called a quasi criminal matter is the writ of habeas corpus in civil causes, which I will later discuss.)

The *people* select and elect the judges for both of said courts. They are just as capable of selecting and electing for the one as for the other. They select and elect the judges of the Court of Criminal Appeals for the purpose, among others, of determining the constitutionality and construction of criminal laws; and select and elect the judges of the Supreme Court for an altogether different purpose. The Supreme Court, discussing this very question in Comrs. Ct. v. Beall, 98 Texas, 104, said: "We think it a reasonable deduction from the establishment of two courts of final resort, one for criminal and the other for civil cases, that it was contemplated that the decisions of each upon the questions pertaining peculiarly to its own jurisdiction should be authoritative and controlling upon all other courts. Let us take the Court of Criminal Appeals, for example. What was more reasonable to conclude than that the court would be composed of lawyers, not only learned in the law, but especially versed in the jurisprudence of its criminal branch and of great experience in the criminal courts, and that by reason of this fact and of the duty devolved upon them to determine, with rare exceptions, questions of criminal law only, their decision upon such questions would be entitled to more weight than that of a court of civil jurisdiction only." The people have expressly and repeatedly determined, and emphatically declared, in substance and effect, by their Constitution, and amendments thereto, that the Court of Criminal Appeals *alone shall* determine the constitutionality, *vel non,* of any and every criminal law enacted by our Legislature, and that our Supreme Court *shall not* do so.

The Supreme Court, as heretofore constituted, has expressly declared

and held, that the Court of Criminal Appeals alone has jurisdiction to determine the constitutionality, *vel non,* and construction, of every criminal statute, and that the Supreme Court has not that right nor jurisdiction. And in such matters said: "The Supreme Court should follow the decisions of the Court of Criminal Appeals," and "We think we may safely say that it has been the rule of this court, . . . to follow the construction placed upon the statutes embraced in our Penal Code and Code of Criminal Procedure by the Court of Criminal Appeals," and that said *"rule is binding authority upon us."* So held the Supreme Court unanimously through Chief Justice Gaines, when that court was composed of him and Justices Brown and Williams. (Comrs. Ct. v. Beall, 98 Texas, 104, 108-9; Green v. Southard, 94 Texas, 470; State v. Schwarz, 103 Texas, 119, and other cases.) And they announced and adhered to that rule, even when they were unanimously of the opinion this court was in error. Not only is the Supreme Court bound by the decisions of this court on criminal matters, but every other lower court of this State for much stronger reasons is so bound. The civil appellate courts have so held.

The Supreme Court of the United States has always held the same doctrine, in Forsyth v. Hammond, 166 U. S., 506, 518-19, saying: "The construction by the courts of a State of its Constitution and statutes is binding on the Federal courts. We may think that the Supreme Court of a State has misconstrued its Constitution, or its statutes, but we are not at liberty to therefore set aside its judgments. That court is the final arbiter as to such questions."

The conclusion is therefore inevitable, that as to all criminal statutes, any opinion, judgment or decision of the Supreme Court of this State as to its constitutionality, has no binding force or effect whatever as authority on any court, or person, in this State. It would have no more authority or legal effect, for instance, than the opinion, judgment or decision, of any court, from the highest to the lowest, of the State of Maine would have, if such court of Maine should hold that a statute of our State under our Constitution was unconstitutional. In other words, any decision, judgment or opinion of our Supreme Court, as to the constitutionality of any criminal statute passed by our Legislature, is without legal authority, power or effect, on any court, or person, in this State. As to criminal statutes, our Supreme Court is just as foreign to our State, and every person and court in it, as if in truth it was a court of the State of Maine, elected by the people of Maine, and located and holding its sessions in said State, under and by virtue of its laws, and not ours.

That our pool hall statute is a criminal statute, and depends exclusively for its construction and enforcement on the criminal courts, no one can question. It is as precisely and certainly so as our local option liquor prohibition statutes are. It was specifically founded upon and wholly modeled after and follows them as directly and positively as could be done. Our Supreme Court in Comrs. Court v. Beall, supra,

p. 108, held: "We are of opinion that our local option statutes are strictly and essentially criminal laws, and as such primarily subject to the decisions of the criminal courts as to their validity and construction." If our people had intended that the Supreme Court should have had any sort of supervisory jurisdiction over the Court of Criminal Appeals, they would have in some direct provision so declared. On the contrary, in their constitutions and amendments thereto, they have clearly excluded any such jurisdiction from the Supreme Court.

Notwithstanding our Supreme Court had no right, jurisdiction, power or authority to decide that our pool hall law is unconstitutional, but, on the contrary, is by our Constitution expressly prohibited from doing so, yet, in the case of Ex parte Mitchell, 177 S. W. Rep., 953, unfortunately, and it seems to me, without mature investigation or deliberation, said that that law was unconstitutional. And this, too, after, and in the very face of, the decision of this court (Ex parte Francis, 72 Texas Crim. Rep., 304), both upon reason and authority, after the most thorough investigation, holding that said statute is clearly valid and constitutional; this court being the only court of supreme and final jurisdiction, power and authority which can legally determine such question. It will be noted that neither the report of the Mitchell case, nor the memo. opinion therein, in any way discloses how the question therein arose, or could have arisen. On the contrary, it seems, the Supreme Court's holding therein was merely gratuitous.

Said holding in the Mitchell case, on its face, shows that it was hastily delivered, on the last opinion day of the term, and in no way backed by reason or argument. The holding itself stating, "a full opinion will be later filed, the preparation of which has been prevented by the approaching close of the term." The report of that case also shows, that no one appeared by brief or otherwise for the State, respondent. More than a year has now passed since it was handed down, and still no "full opinion" has yet been filed. The only two cases cited as authority are State v. Swisher, 17 Texas, 441, on one proposition, and Brown Cracker, etc., Co. v. Dallas, 104 Texas, 290, on the only other proposition. Before the opinion in said Ex parte Francis case, supra, was handed down, in our thorough investigation of the question and authorities, we, more than once, discussed said Swisher case and the questions in said Francis case, with the late lamented Chif Justice Brown of the Supreme Court. He was very familiar with the Swisher case, and with much emphasis said to me: *"The old Swisher case is not the law, and never was the law."* After the opinion in the Francis case was handed down by this court, and just after the Mitchell case had been submitted in the Supreme Court, Chief Justice Brown called for, and was furnished, a copy of our opinion in the Francis case. After thoroughly considering the questions desided therein, and that decision, he more than once said to us: "Your decision is unquestionably correct and the law." Chief Justice Brown died May 26, 1915; an appointment to the vacancy created thereby, was made June 1st

(177 S. W. Rep., 953) and the mere memo. holding in the Mitchell case filed June 23, 1915. I have no apology to make for consulting, and discussing with Chief Justice Brown the Swisher and Francis cases. He was a member of our Supreme Court for many years, and was entirely familiar with our Constitution and the construction and application thereof, and the decisions of our courts, and had himself written a large number of opinions on constitutional questions. I felt I could get aid from him, as well as I could by poring over text-book writers, and opinions of other judges and courts. I regarded him, as I think he was generally regarded, one of our great judges. I have no doubt if he had lived a short time longer, the decision in the Mitchell case would have been the reverse of what it is. What I say is not intended as any reflection, and not even a criticism, of anyone; I am merely recording recent pertinent events.

No one can read the opinion in the Swisher case and reach any other conclusion than that:

1. It was not the opinion, upon mature deliberation and investigation, of the great judges who then composed that court, for they expressly say, "the question presented is not now of very general interest, *as the act, whether constitutional or not, has been repealed.* We shall not, therefore, give to it the elaborate investigation that we would otherwise have felt called on to bestow on it." (p. 448.) And,

2. It, therefore, was unquestionably dictum, pure and simple, and no authority whatever. Chief Justice Brown in Grigsby v. Reib, 105 Texas, 597, correctly defined dictum.

Our Supreme and Civil appellate courts, and this court, have so often held and decided the reverse of what was said as dictum in the Swisher case, as we show in the opinion in the Francis case, as, without any doubt, to destroy, annul and overrule the dictum in the Swisher case, as even any suggestion of argument or authority.

Still further, we show in the Ex parte Mode case, 77 Texas Crim. Rep., 432, 180 S. W. Rep., 708, that the opinion of every other highest appellate court of every State of the United States (with *possibly one* exception) holds the reverse of what is said as dictum in the Swisher case and held in the Mitchell case. So that it is worse than idle to further discuss or consider the Swisher case as any authority whatsoever.

Chief Justice Brown wrote the opinion in Brown Cracker Co. v. Dallas, supra, just shortly before we had the Francis case before us. He knew his opinion in that case was wholly inapplicable to the Francis case, else he could not, and would not, have so emphatically approved the opinion in the Francis case. There can be no question but that the decision in the Brown Cracker Co. case is the law, and we have all the time so held. But it is just as certain that it is wholly inapplicable to the questions in this case. Judge Harper has demonstrated this in the opinions in the Francis and Mode cases, on both reason and authority.

The Brown Cracker Co. case was this: The charter of the City of

Dallas provided, "that no ordinance shall be enacted inconsistent either with the laws of the State, or with the provisions of the Act (charter)." The city passed an ordinance, which Judge Brown says, "an argument to demonstrate that the ordinance permits such houses (bawdy) to exist in that district would be inexcusable, the language is too plain to require explanation or application." (104 Texas, 294.) He quoted art. 500 (361), P. C., which makes it a crime for any person anywhere in the State to keep, etc., any such house, and cited article 503 (362a), which expressly authorizes any person, or the State, to enjoin the actual, threatened or contemplated use of any place for any such house, etc., and said, "the antagonism between the ordinance and the law is as emphatic as that between life and death," and held, the State law "must prevail." He further held that under article 1, section 28, of our Constitution as it now is, the Legislature could not even authorize the City of Dallas to suspend said State law.

The recent decision of the Supreme Court in Middleton v. Texas Power & Light Co., 185 S. W. Rep., 556, is directly and pointedly the reverse of what that court held in said Mitchell case. I will show this:

On April 16, 1913, page 429, the Legislature enacted a law, whereby it fixed, as the Supreme Court said, "the liability of employers for personal injuries to their employees, or for death resulting from such injuries, and the compensation afforded therefor to employees, or their beneficiaries." The Supreme Court further states: "The operation of the Act, as to employers of labor within the State (not excepted by its terms), is this:

"1. *They* may, *at their election, become subscribers under the Act,* or what may be termed consenting members, to its general scheme of liability and compensation, or *remain without its pale.*

"2. If they become subscribers, and give the required notice to that effect to their employees, *they are exempt from all common law, or other statutory liability,* for personal injury suffered by such employees in their service, except that for exemplary damages where an employee is killed through an employer's wilful act or omissions or gross negligence, which may be defended against as under existing law.

"3. If they do not become subscribers, *they are amenable to suits for damages recoverable at common law, or by statute,* on account of personal injuries suffered by their employees in the course of their employment, and are denied the right of making what constitutes the common law defenses thereto. . . ."

Such employers, under the terms of the Act, who subscribe thereunder, do so only from year to year, and at the end of any year *at their option* can cease to become members, or in any way be affected by said Act as subscribers would be.

The Act further provides, that certain features of it shall not be in force "until not less than 50 employers have subscribed, who have not less than 2000 employees"; and "if the number of subscribers after-

wards falls below 50, or the number of employees falls below 2000," then the Act ceases to be in force; but is again put in force when the said number of subscribers reaches the prescribed number of 50, with 2000 employees. Thus by the option of these *employers* only, the law will be in effect one year, and not the next, and will be shuttlecocked back and forth—in force and not in force, as *they,* from year to year, *and no one else,* determine.

The employees have no option whatever as to putting the law in force or preventing it from being put in force. They are at the mercy of their employers—50 to 2000—or rather 1 to 2000, or even 10,000 or more employees, for if 49 employers only subscribed, the Act will not be put in force. If 50 subscribe and then one of them drops out, the law thereby ceases to be in operation. The result is, therefore, that *one employer* alone, can put the law in force, and withdraw it from being in force, at his sweet will, and all *employees,* though there be 100,000 of them, are utterly helpless, as far as putting the law in force, or keeping it from being in force. Of course, the employers would not put and keep the said law in force unless it was in *their* favor, and against their employees.

It is thus seen that if there ever was an *option statute* of the rankest and most radical type, and one which could be alternately suspended, and then put in force—shuttlecocked back and forth, now suspended and now not, and that, too, by an individual or individuals, without even the people having any say thereabout,—this is one. It is so unmistakably so, it is useless to further recite its provisions.

The Supreme Court held: "The Act, in our opinion, *is, in its several provisions, a constitutional law."* (Italics mine.)

This decision of the Supreme Court, being its latest expression, and applying what Chief Justice Brown in the cracker company case said of the State law and Dallas ordinance, I say: The antagonism between the holding in the Middleton case with the holding in the Mitchell case, "is as emphatic as that between life and death," and if from any other court in the land, the last deliberate decision, and not the first hasty and immature utterance,—being a civil and not a criminal statute—should, and would, be followed by all other courts, as well as by that court itself.

It is claimed the occupation tax law, which requires persons who run pool tables to pay an occupation tax as a prerequisite to following that occupation, was "suspended" by the *people* and not by the Legislature, when all the *people* of McLennan County voted by such an overwhelming majority to have said pool hall law enforced in said county, and is, therefore, contrary to section 28, article 1, of the Constitution. In the Middleton case, in precisely the same line of reasoning, the Supreme Court held the *employers* alone, or rather, *one* of fifty, suspends or alternately puts in force that law, against all employees, without such employees, or the people, in any way, having anything to say or do, on the subject! In the first place, the Legislature itself, and

not the people as contradistinguished therefrom, in the pool hall law, "suspended" said tax law, if it has been "suspended." The Legislature had the unquestioned constitutional power under that section, and every other, to suspend said tax law if it so desired. It has many times and uniformly been expressly held by this court, the Supreme Court and our Courts of Civil Appeals that our cities can prohibit sales of liquor within parts of its limits—being non-prohibition territory therein, and make it a crime to do so, and such law is not unconstitutional, because of article 1, section 28, of our Constitution. So far as said occupation tax law is concerned, as to pool halls, it is, in substance and effect, precisely the same as to liquor dealers in "wet"— or other than prohibition territory. I will cite some of these decisions.

One Garonzik for years had legally engaged in the liquor business at a certain place in the City of Dallas,—not prohibition territory,—and had paid all his occupation taxes to do so for another year. The city, however, passed an ordinance prescribing a small district within its limits only, wherein such business could be carried on, and made it a crime for anyone to sell liquor anywhere in the city outside of said district. Garonzik was convicted for violating said ordinance by selling at his said place, although *prior* to the ordinance he had paid all licenses to do so for the time, and appealed to this court. He expressly attacked said ordinance on the ground it was void and unconstitutional under article 1, section 28, because it suspended said State tax law. This court in a unanimous opinion, held the city had the right to enact and enforce said ordinance, and it did not violate said constitutional provision. (Garonzik v. State, 50 Texas Crim. Rep., 534.) Exactly the same was held in Ex parte Levine, 46 Texas Crim. Rep., 364, and in Ex parte King, 52 Texas Crim. Rep., 383, and other cases by this court; and by the Supreme Court in Henderson v. Galveston, 102 Texas (163), 171, wherein the Supreme Court said: "All the contentions advanced by appellant under article 1, section 28, of the Constitution are decided correctly in Ex parte King, 52 Texas Crim. Rep., 383, and in others therein referred to. *Discussion of the question is unnecessary.*" The same thing was held in Cohen v. Rice, 101 S. W. Rep., 1052, by our Court of Civil Appeals at Dallas. It has always been so held by every court of this State until said Mitchell case was hurriedly decided.

Further, as to the constitutionality of said pool hall law. It was passed by a very large majority of both houses of the Legislature, and approved by the Governor. Each legislator, and the Governor, took exactly the same oath to support the Constitution of this State that the Supreme Court justices did, and every other officer does. The legislators by a large majority of each house, and the Governor, and the judges of the lower courts, and this court, under their official oaths, after the most thorough investigation, hold said law is constitutional. Each of these persons, and tribunals, had the unquestioned right, and

it was his duty, to pass on and determine the constitutionality of said law.

In Winn et al. v. Dyess, County Attorney et al., 167 S. W. Rep., 294, an election under said pool hall Act had resulted in favor of putting that law in force in Bell County. Winn and others *at that time* were engaged in running pool halls, had full equipments therefor and were making money thereby and had paid all taxes and procured licenses for that purpose, which were then in force. And they had filed a suit to contest the validity of such election. They then sought an injunction from the District Court against the county attorney, and other officers, from prosecuting them for running their pool halls pending their election contest suit. The district judge denied them an injunction and they appealed to the Court of Civil Appeals at Austin. That court, through Chief Justice Key, in an able opinion, showing thorough investigation of the question unanimously, correctly held: "If the entire statute is unconstitutional, appellants will have the right to interpose that defense in whatever legal proceedings may be instituted by the county officers to enforce that law in Bell County, and, therefore, appellants will have an adequate remedy at law; and, having such remedy, they are not entitled to relief by injunction or otherwise from a court of equity. City of San Marcos v. International & Great Northern Ry. Co., 167 S. W. Rep., 292, recently decided by this court." The Court of Civil Appeals at Dallas (Roper v. Lumpkins, 163 S. W. Rep., 110), had already, in a unanimous opinion, held said pool hall law constitutional and affirmed the district judge in denying an injunction against the officers to prevent an election under said pool hall law. The judges of these two courts are conceded by all to be judges of great learning and ability, and have long been members of the courts they constitute, and their opinions deservedly have great weight.

Thus we see all three of the departments of this State, legislative, executive and judicial, which have the unquestioned authority, jurisdiction and power to pass upon and determine the constitutionality of the pool hall law, expressly hold it constitutional, and two judges of the Supreme Court, against one of its members, hold said law unconstitutional, when that court had no authority, jurisdiction, right or power to determine such question, but by the Constitution are expressly prohibited from doing so. And yet, it seems, there may be some persons who want to make the decision of the two Supreme Court judges an excuse to protect persons in the flagrant violation of said pool hall law!

Our Constitution, prior to 1876, expressly gave the Supreme Court, and judges thereof, original jurisdiction to issue a writ of habeas corpus in both criminal and civil matters. The 1876 Constitution expressly deprived that court and the judges thereof of such jurisdiction in criminal matters, and expressly conferred such jurisdiction exclusively on said Court of (Criminal) Appeals and judges thereof; but never, at any time, conferred on said Court of (Criminal) Appeals such jurisdiction in *some exclusively civil* probate proceedings, nor deprived

the Supreme Court of such jurisdiction in such exclusively civil pro-
bate matters.   Both courts have uniformly, and in many cases, so held.
(Ex parte Berry, 34 Texas Crim. Rep., 36; Legate v. Legate, 87 Texas,
248, and other cases from both courts.)

By 1891 it was demonstrated to the people that the civil courts could
not properly control such courts, and persons connected therewith, unless
the Supreme Court should be reinvested with power to issue, and de-
termine questions arising on, writs of habeas corpus such as punish-
ment for contempt, growing out of exclusively civil causes.   In other
words, that the Supreme Court should have the privilege to first issue
said writ and hear and determine all matters arising out of such exclu-
sively civil proceedings, and that the Court of Criminal Appeals in
such civil proceedings, should not have exclusive jurisdiction.   It is
unnecessary to state the reasons for this.   They are obvious.   Hence,
by said 1891 constitutional amendments the people reclothed the Su-
preme Court and judges thereof with power to issue such writ *"as may
be prescribed by law."*   Thereupon, the Legislature gave the Supreme
Court, or any justice thereof, power to issue said writ *only* "where
any person is restrained in his liberty by virtue of any order, process
or commitment issued by any court or judge, *on account of the viola-
tion of any order, judgment or decree theretofore made, rendered or
entered by* such court or judge in *any civil* cause."

The constitutional, judicial and legislative history of our State, well
known to all, in connection with the provisions and amendments of
our Constitution itself, caused us to be of opinion that the people and
Legislature clearly intended the Supreme Court, in said exclusively
*civil* proceedings, should, in preference to this court, first have the
opportunity to determine whether or not it would issue a writ of habeas
corpus.   Hence, respecting that intention, and in express deference to
the Supreme Court, in the companion cases of Ex parte Zucarro, 72
Texas Crim. Rep., 214, and Mussett, id., 487, we declined to issue said
writ until the Supreme Court should first be given an opportunity to
do so.   For this court in the Zucarro case I said: "Certainly, the
Legislature intended thereby (art. 1529, Revised Civil Statutes) to
make certain that the Supreme Court had power and authority to issue
the writ of habeas corpus in such cases as therein provided, and we
think by the amended Constitution and said Act of the Legislature it
was intended that the Supreme Court should first be given an oppor-
tunity to take jurisdiction in such matters as are provided for by said
statute, in civil matters"; and Judge Harper in the Mussett case said
substantially the same thing.   He said: "It was contemplated and in-
tended that when an application for a habeas corpus grew out of a *civil*
suit that the Supreme Court should entertain jurisdiction. . . ."
And further: "We think as a matter of policy both courts should not
exercise it (issue the writ) in this character of cases, and only in ex-
treme cases would we feel called upon to issue the writ in any case,
where, by law, the matter should properly go to the Supreme Court for

final review in the ordinary course of court procedure." In both of those cases we dismissed or denied the writ without prejudice, so the parties could, as they did, apply to the Supreme Court, which granted the writs, heard the causes and discharged the parties. Such "extreme case" recently arose in Ex parte Duncan, 78 Texas Crim. Rep., 447, 182 S. W. Rep., 313, as explained therein.

"Much ado" is made in the dissenting opinion herein, because we said in the Zucarro and Mussett cases, that the fine and imprisonment by the lower court, from which they sought relief by habeas corpus, grew out of a *civil* cause. There can be no doubt that that was true. My dissenting brother then not even intimated a doubt thereof. Surely, no one can doubt it. The "much ado" is now made, however, and a clear misapplication thereof attempted, because the case of Reed v. Mc-Namara, County Attorney, etc., which caused this proceeding, may also be termed a *civil* case. No one questions that. We specifically so treated it in Judge Harper's opinion herein, and show that whatever final judgment might have been rendered therein could in no event have been appealed to this court. But, when it is stated that both were *civil* cases, all further resemblance ceases. "The antagonism between them is as emphatic as that between life and death." In the one, the county attorney of Tarrant County sued Zucarro and Mussett and enjoined them from flagrantly violating a *criminal* law of this State, on several grounds stated in the Zucarro case, supra, as the statute and law expressly authorized. In the other, Reed sued the county attorney of McLennan County, and procured the shield and protection in advance of his sworn intention to openly and flagrantly violate a crimial law of this State, by having a district judge enjoin and prohibit the county attorney from discharging his sworn constitutional and statutory duty of prosecuting him when he should commit the intended crimes. I think no such legal monstrosity was ever before heard of as was attempted in the Reed case. There is no possible conflict either in principle, or in fact, between the Zucarro and Mussett cases and our holding in this cause.

It is claimed, however, as an excuse or pretense, for Reed having the county attorney so enjoined, that he had *vested property rights,* and that therefore a judge of the District Court, in a *civil* suit, an appeal from which could never reach this court, had jurisdiction and power to defy and violate the express decision and solemn judgment of this court in this very matter, take it out of the criminal courts, and himself be shielded and protected in his express avowed intention to violate said criminal law, and prevent even his prosecution in the criminal courts when he carried out his intention and actually, openly and flagrantly committed·said crimes. That his action of thus inducing said injunction by the district judge in this instance, if not prevented by this court, was intended to have, and would have had, apparently at least, this effect, no one can question.

That said pool hall law as stated is exclusively a criminal law, no one

can deny. The Ex parte Francis case was instituted and prosecuted to final adjudication in this court, for no other reason or purpose whatever than to have determined and adjudicated, legally and constitutionally, by the only court of supreme and final jurisdiction and power which could determine such question, whether or not it was constitutional. Francis was a party on one side, and all other persons in this State were parties on the other side. It was wholly unnecessary and improper to have named all the other persons on the other side from Francis. They were as clearly included in the name of "The State" as if they had been individually named. This would include, of course, Reed himself and his attorneys, and the district judge whom he induced to so enjoin in his behalf. This is so in every case where the State is a party to any case. (Of course, these other persons would not be such parties as to disqualify them as jurors, or other officials in such causes.) This has been expressly held in principle by the Supreme Court in Hovey et al. v. Shepherd, District Judge, et al., 105 Texas, 237, wherein the Supreme Court issued and enforced a writ of prohibition commanding the district judge and parties to that suit, from further interference by injunction or otherwise with its solemn judgment in another cause. That court through Chief Justice Brown saying that by their action in seeking and procuring an injunction, against the enforcement of the Supreme Court judgment in such other cause, thereby "manifesting a disregard of and contempt for law, and the swift compliance of the judge in granting the injunction without a hearing, were sufficient to admonish this court that its authority must be exercised promptly and firmly to maintain the dignity of the State's judiciary. The writ of prohibition is the only effective preventive remedy appropriate to the conditions which confront us, therefore we have authority to use it to guard and enforce our jurisdiction. . . . .

"The interveners were not parties to the suit of the City of Sweetwater v. The Kansas City, Mexico & Orient Railroad Company at the time the judgment of this court was entered (in that suit), but they were citizens of that municipal corporation, and the important question in the case is reached by the announcement of the well settled proposition of law that, if the matter adjudicated affected the interest of the public as distinguished from the private interest of the citizens of the city, although not parties to the (other) suit, *all citizens are concluded thereby*. Cannon v. Nelson, 83 Iowa, 242; Clark v. Wolf, 29 Iowa, 197; 2 Black on Judgments, sec. 584; McEntire v. Williams, 63 Kan., 275; Sampson v. Comrs., etc., 115 Ill. App., 443."

Two cases could hardly be more alike in principle than that and this case. And to precisely the same effect is the decision of the Supreme Court in Conley v. Anderson, 164 S. W. Rep., 985. The decision of that court in Milam Co., etc., v. Bass et al., 106 Texas, 260, is not only not in conflict with the two cases from that court just cited, but is an express approval of them, as a reading of it will demonstrate.

It is absolutely essential that every appellate court, of supreme and

final power and jurisdiction, should and must have the authority and power to enforce its own jurisdiction and judgments—"to guard and enforce its jurisdiction" and "to maintain the dignity of the State's judiciary." Such power and authority would be implied as inherent in every such court. No court would or could be a real court without this. But it is not necessary to resort to this implied inherent power and authority, in this instance, for the people, in our Constitution, *expressly* conferred on this court such *power and authority "to issue such writs as may be necessary to enforce its own jurisdiction."* (Sec. 5, art. 5, Constitution.)

Constitutions and statutory "laws conferring jurisdiction on courts must necessarily be in words somewhat general." (Chief Justice Stayton in Pickle v. McCall, 86 Texas, 212, 219.) "This court has plenary power over its *judgments* during the term, and even after the term . . . in order to support its jurisdiction. . . ." (McCorquodale v. State, 54 Texas Crim. Rep., 344, and cases therein cited.) "This court has heretofore fully recognized its power to inquire into, and maintain, its jurisdiction, *and will take all proper steps to determine and enforce that jurisdiction."* (Id., p. 363.) "This court will not permit any disobedience of, nor interference with, its judgment . . . by any judge of any court of this State, nor by any other person." (The State, ex rel. Atty Genl. v. Hamblen, Dist. Judge, 74 Texas Crim. Rep., 526, and authorities therein cited.) These principles are so well established by all authorities and reason no discussion of them is necessary.

Now, what have we in this cause? Francis sued out and was granted by this court, a writ of habeas corpus, for no other purpose whatever, than to test, and have judicially determined, the constitutionality, *vel non,* of said pool hall law, for a violation of which he had been arrested, and was then held by valid proceedings by the State against him. There can be no possible doubt by anyone that this court had the unquestioned right, power, and jurisdiction to grant said writ, hear said cause and determine said question. It did so, after hearing most forcible oral arguments and elaborate briefs by eminent and able attorneys, and after the most exhaustive investigation and thorough consideration, and then and there determined that said law was plainly and clearly constitutional, and so wrote its opinion, and entered its solemn judgment. This opinion and judgment is binding and conclusive on every court and person in this State. No court, and no person, had the right, power or jurisdiction to annul, vacate or set them aside, neither by any direct, nor especially, by any indirect, proceedings. But Mr. Reed, by an indirect proceeding, did attempt to have one of the district judges to do this very thing for him—to annul, vacate and set aside the opinion and judgment of this court, by enjoining the county attorney from even prosecuting him when he should openly and flagrantly violate said law and the opinion and solemn judgment of this court, as he asserted he would do. If this could be thus done, then likewise every other opinion and judgment of this court could be annulled, vacated and

set aside by any and every district judge, and perhaps county judge also, and no criminal law of this State could be enforced unless graciously permitted by such inferior judges. No such inferior judge is given directly, or indirectly, any such power, authority or jurisdiction, and any assumption of the same by any such judge is an absolute usurpation, and whatever he does attempting this is a nullity and void. It is inconceivable that under such circumstances, it should be even thought by anyone that this court is utterly powerless to protect and enforce its own jurisdiction and judgment. It is not powerless to do so, but is by the Constitution fully and expressly clothed with power, authority and jurisdiction, by the writ of prohibition, to protect and enforce its jurisdiction and judgment. This is the very object and purpose of the ancient writ of prohibition. When we granted and issued said writ herein we were not invading the jurisdiction of any civil court or cause—we were simply and solely preventing usurpation of power, authority and jurisdiction, and preserving the sanctity of the jurisdiction and judgment of this court.

The agreed facts and record herein conclusively show that Reed had no *vested* property rights whatever, which he even could pretend justified him to have a district judge and himself defy and violate the law and said opinion and judgment of this court. The facts are:

The pool hall law was enacted March 31, 1913. Prior thereto he had been in the business of running a pool hall in Waco. Our decision and judgment in the said Francis case was rendered January 4, 1914. In April, 1914, as soon as said law was put in force in McLennan County, he voluntarily quit that business. The memo. opinion in the Mitchell case was filed June 23, 1915. Immediately thereafter he set about to fraudulently attempt to *then create* some sort of claimed *vested* property rights. He had none before. Just immediately before he filed his injunction suit, on July 26, 1915, he paid the State and county what would be the tax in territory where not prohibited, to run pool tables, and then rented a house in Waco, so as to illegally place and run his pool tables. No case can be found where any court has ever yet held that a person can fraudulently *create* pretended *vested* property rights, after a law has been enacted and in force, and then claim that a court of equity has power or authority by injunction or otherwise to prevent his prosecution for his crime in violation of such law. At most, a court of equity might have power and authority to thus protect him in his *vested* property rights, acquired *before* such law was enacted, but not *afterwards* purposely and fraudulently acquired.

As Mr. Reed had no vested property rights, he was in no attitude to be entitled to an injunction in any contingency. I therefore think it unnecessary to discuss the question on the theory that he had vested property rights. However, even if he had had, the authorities are overwhelming that his remedy was not by injunction, but by defending criminal prosecutions in the criminal courts on the ground of the

claimed unconstitutionality of said law. Of course, it would have been wholly unnecessary for him to have had any property rights, in order to have successfully defended, if the law had not been constitutional. This is particularly and especially so under our judicial system, where our criminal and civil jurisdiction and courts are so wholly separated and distinct.

It would be idle, if not silly, for Reed to contend that a court of equity would have jurisdiction to enjoin the county attorney from prosecuting him at all because he should frequently violate said law—that he should be immune from all prosecution to avoid a multiplicity of prosecutions. A very easy and simple method to avoid frequent prosecutions, would be to stop violating the law  If there was no violation, there would be no prosecution, frequent or otherwise. The doctrine of multiplicity of prosecutions has no application in this cause.

I will briefly state my individual views of why the writ of habeas corpus is applicable, and was issued in this matter. A decision of the question, however, became immaterial because of the disposition of the case by writ of prohibition. My views are supported by reason and numerous authorities other than our statute, which I will not now cite.

Originally the writ of habeas corpus was issued and used to release a person from actual physical confinement which prevented his free locomotion at his will. But our statute expressly enlarged the use and purpose of the writ. It enacts:

"A writ of habeas corpus is an order issued by a court or judge of competent jurisdiction, directed to anyone having a person in his custody, *or under his restraint,* commanding him to produce such person, at a time and place named in the writ, and show why he is held in custody, *or under restraint."* (Art. 161, C. C. P.)

"By 'restraint' is meant the kind of control which one person exercises over another, not to confine him within certain limits, *but to subject him to the general authority and power of the person* claiming such right." (Art. 182.)

"Every provision relating to the writ of habeas corpus shall be *most favorably* construed in order to give effect to the remedy, *and protect the rights of the person seeking relief under it."* (Art. 164.)

The district judge, in this instance, did not have Mr. McNamara imprisoned in jail, or elsewhere, nor did he have him chained, or tied, so as to prevent his physical locomotion at will, but by his injunction, without a shadow of doubt, he had him *restrained,* and under his control, and subject to his, not only *general,* but *special,* authority and power, to absolutely prevent him from doing his sworn official duty. Mr. McNamara had fine and imprisonment both staring him in the face, and doubtless would have been inflicted with both, if he had made any move to have discharged his sworn duty. How he could have been more grievously *restrained* and subject to the authority and power of the district judge, I fail to see. As quoted, the statute expressly distinguishes between being physically "in custody," and otherwise "under

restraint" not confined, and one entitled him to the writ as much as the other. The statute itself makes the two so distinct and clear it is wholly useless to further now discuss or illustrate them.

It is my opinion that this court also had the right and power, and if necessary it was its duty, to have issued, and compelled by, mandamus the district judge in this matter to vacate said injunction granted by him, and permit the county attorney to discharge his constitutional and statutory duty of prosecuting Reed for violating said pool hall law. This to guard and enforce the jurisdiction, and to maintain and enforce the judgment, of this court, as expressly authorized by our Constitution. (Art. 5, sec. 5.) In Terrell v. Greene, District Judge et al., 88 Texas, 539, that district judge, by his order, refused to permit the county attorney to take charge of and prosecute a suit in behalf of Tarrant County, as he had the authority, and was his duty, to do. The Supreme Court in an original proceeding by peremptory mandamus commanded said district judge to permit said county attorney to discharge his said duty. However, this court accomplished the same result herein by the writ of prohibition, and mandamus was, therefore, unnecessary. Hence, I will not discuss the right of this court to issue and enforce the writ of mandamus herein.

I fully concur in Judge Harper's opinion, and the judgment herein entered.